**Affirmed and Opinion filed July 26, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00040-CV

## DAEWOO SHIPBUILDING & MARINE ENGINEERING, CO., LTD. D/B/A DSME, Appellant

### V.

## IKANCO, INC., CHOONG S. KIM, AND YONG J. AN, Appellees

**On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 2008-68072**

## O P I N I O N

This is a contract interpretation case. Appellee ikanco, Inc. [sic] sued appellant Daewoo Shipbuilding & Marine Engineering, Co., Ltd. d/b/a DSME for breach of a contract pursuant to which ikanco was to provide services to aid Daewoo in securing a shipbuilding project.[1] The trial court deemed the two-page contract between ikanco and Daewoo ambiguous and submitted it to the jury for interpretation. The jury determined

---

[1] Appellees Choong S. Kim and Yong J. An are the sole shareholders of ikanco. Although they also brought claims in their individual capacities against Daewoo, none of those claims are at issue in this appeal. Unlike ikanco, neither Kim nor An was granted any relief in the verdict or the final judgment.

Daewoo breached the agreement by refusing to compensate ikanco for services as required under the agreement and awarded $3,484,589 in damages to ikanco. On appeal, Daewoo contends that the trial court should have interpreted the contract, and should have determined that Daewoo did not breach it, as a matter of law. Finding that the trial court properly submitted the case to the jury, we affirm.

## I. Background

In 2003, ConocoPhillips entered into an agreement with Qatar Petroleum, the Qatari national oil company, to develop a large-scale natural gas project in Qatar. The project was labeled "QatarGas III" and was one of several Qatari gas projects in development at the same time. As part of the project, ConocoPhillips intended to have a number of supertankers built to transport the gas to market. Daewoo, a large, Korean shipbuilding company, became interested in obtaining orders to build tankers for the project.

Yong J. An is an attorney in Houston who had established relationships with certain ConocoPhillips executives. Choong S. Kim is a former Daewoo executive who had maintained ties within the company. In 2003, An and Kim formed ikanco with an eye toward aiding Daewoo in obtaining ship orders from ConocoPhillips in return for compensation. On December 5, 2003, Daewoo and ikanco entered into a two-page letter agreement, which reads in its entirety as follows:

> Re: NEWBUILDING OF LNG CARRIERS FOR CONOCOPHILLIPS (so-called, "Qatargas III Project")
>
> We hereby confirm that in respect of the forthcoming captioned newbuilding tender for LNG Carriers (the "Project"), the following has been mutually understood and agreed:
>
> 1. ikanco, Inc. ("ikan") shall provide Daewoo Shipbuilding & MarineEngineering Co., Ltd. ("DSME") on the exclusive basis with all services as reasonably required by DSME and in ikan's maximum capacity during the bidding, and execution of the Project in order for DSME to secure and successfully execute the Project (the "Services["]).
>
> 2. DSME shall nominate ikan as its Representative for the Project.

2

3.	In compensation for its due and full performance of the Services, DSME shall pay to ikan Zero Point Five Percent (0.5%) of the net Contract Price in total.

4.	No compensation shall be payable to ikan in case ikan fails to duly and fully perform the Service.

5.	If DSME fails to secure the Project, or the Project is canceled for whatsoever reason, this agreement shall be automatically terminated and null and void.

6.	After award of the Project to DSME, both parties hereto shall enter into a formal commission agreement.

7.	This agreement shall be good and valid for a period of two (2) years after signing date of this agreement unless otherwise agreed in writing.

8.	This agreement shall be strictly confidential and shall not be disclosed to any third parties.

9.	This agreement shall be subject to English law and jurisdiction.

After signing the December 5, 2003 contract with Daewoo, An and Kim arranged several meetings and visits between Daewoo and ConocoPhillips executives regarding the building of ships for the Qatargas III project.  In March 2004, Daewoo and ConocoPhillips entered into a Letter of Understanding concerning the purchase of tankers for the project.  Ultimately, however, the purchase of tankers for the various Qatari natural gas projects was turned over to a consortium made up of representatives of both Qatari and non-Qatari partners in the various projects.  ConocoPhillips played a role in the consortium but apparently did not lead the overall effort.

In January 2005, Daewoo entered into a Long-Term Ship Supply Agreement ("LSSA") with the Qatargas Operating Company, which was the authorized representative of ConocoPhillips, Qatar Petroleum, and other participants in the ship consortium.  Among other things discussed below, the LSSA reserved ship-building capacity and determined the numbers and types of tankers to be built as well as projected build dates.  Once constructed, the tankers were to be owned by another Qatari entity, Nakilat.  After entering the LSSA, Daewoo executives publicly expressed that they had "secured" the building of 13 to 15 tankers for the consortium.  While the LSSA did not

3

specifically require the construction of any ship, it did provide for liquidated damages in the event ships were not built under its terms. Ultimately, three ships were ordered from and built by Daewoo pursuant to the LSSA for the Qatargas III project at a cost of around $696 million. The actual purchase contracts for these ships were signed after expiration of the agreement between Daewoo and ikanco.

Daewoo refused to pay any compensation to ikanco, and ikanco filed suit. Prior to trial, the trial court denied Daewoo's motion for summary judgment premised on the argument that the contract was unambiguous and Daewoo did not breach it as a matter of law. After trial, Daewoo raised the same issues in a motion for judgment notwithstanding the verdict (JNOV), but the trial court never ruled on this motion. As stated, the jury found that Daewoo breached the contract and assessed damages. In two issues, Daewoo contends that (1) the agreement unambiguously required Daewoo to pay compensation to ikanco only if Daewoo secured a contract to build ships directly for ConocoPhillips, and the evidence conclusively demonstrated that no ships were sold to ConocoPhillips, and (2) time was of the essence in the contract and Daewoo did not secure any binding contract to build relevant ships prior to the expiration of the agreement between Daewoo and ikanco.

## II. Standards of Review

Daewoo stresses that its issues are questions of law.[2] The construction of an

___

[2] [I]kanco asserts that Daewoo waived its appellate arguments by not objecting to the submission of the contract issues to the jury and, indeed, requesting such submission. We disagree. Daewoo expressly raises only questions of law. Although Daewoo did not specifically object to submission of the case to the jury, it asserted its points in a motion for summary judgment prior to submission of the jury charge and in a post-verdict JNOV motion. [I]kanko further complains that Daewoo failed to get a ruling on its JNOV motion. While the trial court did not expressly rule on the JNOV motion, such motions can be overruled by operation of law under Texas Rule of Civil Procedure 329. Tex. R. Civ. P. 329; *Equistar Chem., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 866 (Tex. 2007) ("Dresser's . . . motion for judgment notwithstanding the verdict [was] overruled by operation of law."); *Brown v. Zimmerman*, 160 S.W.3d 695, 702 n.7 (Tex. App.—Dallas 2005, no pet.) ("The trial court did not rule on the motion for [j]nov therefore the motion was overruled by operation of law."). Daewoo therefore apprised the trial court of its points that are questions of law and preserved them for appellate review. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94-95 (Tex. 1999) (explaining that pure questions of law are generally not waived by failure to object to the jury charge unless the trial court was required to resolve the legal issue before the jury could properly perform its fact-finding role); *see also Ulico Cas. Co. v. Allied Pilots Ass'n*,

4

unambiguous written contract is a question of law for the court. *See Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006). Whether a contract is ambiguous is also a question of law; one that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011). When construing a contract, we must ascertain the true intentions of the parties as expressed in the writing itself. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011). In identifying the intention of the parties, we examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If, after the rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. On the other hand, an agreement is ambiguous, creating a fact issue on the parties' intent, if it is susceptible to more than one reasonable interpretation. *Ashford Partners, Ltd. v. ECO Res., Inc.*, No. 10-0615, 2012 WL 1370847, at *3 (Tex. Apr. 20, 2012).

We begin our analysis with the contract's express language. *Italian Cowboy Partners*, 341 S.W.3d at 334; *see also Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *See Valence Operating Co.*, 164 S.W.3d at 662.

Where the parties have entered into an unambiguous written contract, the instrument alone will be deemed to express the intention of the parties because it is the

---

262 S.W.3d 773, 777 (Tex. 2008) (holding party that filed motions for summary judgment, directed verdict, and JNOV preserved complaint that issue should not have been submitted to jury even though party submitted jury questions on same issue). We note, however, that in portraying its claims as purely matters of law, particularly in its reply brief, Daewoo has expressly restricted the points on which it is seeking reversal.

objective intent, not subjective intent, that controls. *See Matagorda Cnty Hosp. Dist.*, 189 S.W.3d at 740. An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. *Anglo-Dutch Petroleum*, 352 S.W.3d at 451. The parol evidence rule, however, does not prohibit consideration of surrounding circumstances that inform rather than vary from or contradict the contract text, including the commercial or other context in which the contract was executed. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

### III. "For ConocoPhillips"

In its first issue, Daewoo contends that the trial court erred in determining that the contract was ambiguous concerning the prerequisite to ikanco's compensation. Daewoo insists that there was only one reasonable way to interpret the agreement: ikanco would be entitled to compensation only if Daewoo built ships specifically for and sold ships directly to ConocoPhillips for the Qatargas III project.

### A. Daewoo's Interpretation is Reasonable

The agreement itself identifies its subject matter as "NEWBUILDING OF LNG CARRIERS FOR CONOCOPHILLIPS (so-called, 'Qatargas III Project')." It further specifies in the first paragraph that ikanco was to provide "all services as reasonably required . . . during the bidding, and execution of the Project in order for DSME to secure and successfully execute the Project." Additionally, if Daewoo failed "to secure the Project, or the Project [was] canceled for whatsoever reason," the agreement would automatically terminate.

Daewoo contends that the phrase "for ConocoPhillips" in the heading, and the apparent reference to the heading in the first paragraph, required that ConocoPhillips be the purchaser of the tankers in order for ikanco to be compensated for its services. In support of its interpretation, Daewoo recounts considerable detail concerning the

circumstances surrounding execution of the agreement between Daewoo and ikanco, including the professional backgrounds of An and Kim and the development of the Qatari gas fields.[3] Daewoo's clear goal in entering the agreement was to obtain aid in securing a contract to build ships related to the Qatargas III project. ConocoPhillips was a key player in that project. An had connections at ConocoPhillips that Daewoo hoped to exploit to secure shipbuilding for the project.

Moreover, there seems to be little dispute that at the time the agreement was signed, it was believed that ConocoPhillips itself would be the purchaser of the ships. Stated another way, the only expected "tender" for ships was from ConocoPhillips. Those expectations changed when a consortium was formed for ship purchasing for Qatari gas projects, meaning ConocoPhillips no longer exclusively controlled the purchasing of ships for the Qatargas III Project (to the extent it ever did exclusively control such purchasing). While Daewoo acknowledges that ConocoPhillips played a role in the consortium and was still deeply involved in the Qatargas III Project, Daewoo minimizes ConocoPhillips' role after the consortium was formed.[4] However, although events occurring subsequent to execution of the contract might be relevant to performance or breach, they generally are not salient to understanding the intent of the parties as expressed in the contract. *See Anglo-Dutch Petroleum*, 352 S.W.3d at 450-52.

Given the circumstances surrounding execution of the contract, particularly the apparent expectation that ConocoPhillips would be the buyer, Daewoo's interpretation of the agreement appears to be a reasonable one. On the premise that this was the only reasonable interpretation, Daewoo argues that because the ships were ordered by the consortium and, after their construction, owned by Nakilat, ikanco was not entitled to any compensation as a matter of law.

---

[3] Daewoo also goes into considerable detail regarding what services ikanco provided under the agreement; however, Daewoo does not contend that ikanco failed to perform services required under the agreement.

[4] However, Peter Noble, ConocoPhillips' chief naval architect, stated that he, an employee of ConocoPhillips, was a "key figure in driving the Qatargas III Project."

7

## B. [I]kanco's Interpretation also is Reasonable

We do not agree, however, that Daewoo's interpretation of this sparse two-page letter agreement is the only reasonable interpretation. Nothing in the text of the contract, or in the circumstances surrounding its execution, mandated that ConocoPhillips be the actual purchaser and owner of the vessels. The parties used the phrase "for ConocoPhillips," a fairly generic, nonspecific heading. "For ConocoPhillips" does not clearly exclude the possibility that the entity placing the order or in whose name the ships might be owned could be an entity different than ConocoPhillips. "For ConocoPhillips" could include circumstances in which ConocoPhillips was to benefit from or use the ships, even though the purchase price might come through a different entity and the ships might be registered by still another different entity.[5] To exclude these circumstances, the parties could have used more specific terms, such as "sale to," "purchase by," "contract with"; however, they did not.

Furthermore, as Daewoo has urged, we may consider the context in which the agreement was signed. *See Houston Exploration Co.*, 352 S.W.3d at 469. Undisputed testimony at trial indicated that it is common practice in the shipping industry for the ships required for a project to be owned by a different entity and leased to the user even though the user secured the shipbuilding contract and issued the specifications.[6]

---

[5] Among many possibly applicable alternatives, the dictionary defines "for" as meaning "to supply the need of," and also indicates that it can be used "to indicate the person or thing that something is to be delivered to or used by." *See Webster's Third New International Dictionary* 886 (1993).

[6] In explaining why the Letter of Understanding between Daewoo and ConocoPhillips contained an "Assignment clause," Noble stated that "at this stage in the development of a project, we don't know who's going to own the ships. We want to secure the slots and the pricing; but we needed the option to say if they secure the slot . . . , we didn't want the slot to go away. We wanted that to be available to be assigned to other parties." He further explained,

> Well, basically it's a model that many companies use, and we use most of the time, is [sic] we will develop the design we require, we'll do some shipyard selection, maybe one, maybe more, for the pricing. Then we will go to a ship owner and say, "We will enter into a long-term charter agreement with you: 10, 12, 25 years." And on the basis of the long-term charter, the ship owner can then obtain financing to go to the shipyard on the prenegotiated specification price. So it's normally through a long-term—our relationship is through a long-term charter party, and "our" being QatarGas III at this stage, which was a joint project. And that's our normal process.

Nevertheless, Daewoo dismisses the possibility that the ships could be built "for ConocoPhillips" and the Qatargas III Project even if ConocoPhillips was not the direct purchaser because "no reasonable person would read . . . [the] agreement . . . in this way." But Daewoo offers no compelling explanation as to why only a direct sale to ConocoPhillips would mean the purposes of the agreement were fulfilled. It points out that An apparently had no other connections that would be of help to Daewoo, but if An's connections with ConocoPhillips assisted Daewoo in securing a contract to build ships for the Qatargas III Project, then Daewoo would benefit whether or not ConocoPhillips itself directly paid for and owned those vessels.

Daewoo makes an additional argument based on earlier drafts of the letter agreement. It asserts that Daewoo executives were concerned about the vagueness of the contract terms in those earlier drafts. According to Daewoo, the solution "was to revise the broker agreement so that it explicitly limited ikanco's potential commission under the agreement solely to ship sales to ConocoPhillips in connection with Conoco's Qatargas III project deal." This argument is self-defeating, as this language is not in the final agreement. There is no mention of "sales to ConocoPhillips" instead, the agreement references "Newbuilding . . . for ConocoPhillips."

[I]kanco presented an alternative reasonable interpretation of the agreement: it was entitled to compensation provided Daewoo secured a project to build ships for ConocoPhillips in regards to Qatargas III, without regard to whether ConocoPhillips itself placed the order for ships or ultimately owned the ships. Because the contract was susceptible to at least two reasonable constructions, the trial court did not err in instructing the jury to interpret the contract. *See Ashford Partners, Ltd.*, 2012 WL 1370847, at *3.

---

He additionally stated that the system ultimately used for Qatargas III was similar to this model with Nakilat as the ship owner. Noble also acknowledged that he, an employee of ConocoPhillips, was a "key figure in driving the Qatargas III Project."

9

## IV. "Secure the Project"

In the second part of its first issue, Daewoo argues that as a matter of law, ikanco was not entitled to any compensation because Daewoo did not "secure" any ship-building project related to ConocoPhillips and Qatargas III until after expiration of the agreement by its own terms. Under paragraph 1 of the agreement, ikanco was to "provide . . . all services as reasonably required by [Daewoo] during the bidding and execution of the Project in order for [Daewoo] to secure and successfully execute the Project." Paragraph 3 provided that ikanco was to receive "compensation for its due and full performance of the Services." Paragraph 5 states that if Daewoo "fails to secure the Project, or the Project is canceled . . . this agreement shall be automatically terminated . . . ." Under paragraph 7, the agreement was "good and valid for a period of two (2) years" (December 5, 2003 to December 5, 2005).

The parties dispute whether the signing of the Long-term Ship Supply Agreement (LSSA) in January 2005 (*i.e.*, within the two-year contract term) "secured" the shipbuilding project, thus entitling ikanco to compensation.[7] Daewoo's position is that (1) the agreement unambiguously required that a binding contract for building ships must be signed within the two year term in order for ikanco to be entitled to compensation and (2) the LSSA unambiguously was only an option agreement and not a binding shipbuilding contract.[8]

We again find ambiguity in the contract. Although it is plausible that the parties intended for the term "secure," as used in the agreement, to refer exclusively to the signing of a binding shipbuilding contract, it also is plausible that a contract such as the LSSA, which among other things reserved shipbuilding capacity and provided for

---

[7] The shipbuilding contracts were signed in May 2006.

[8] Again, Daewoo steadfastly maintains that its points are strictly questions of law and not challenges to the legal or factual sufficiency of the evidence presented at trial. Although Daewoo did not specifically argue in its JNOV motion that the LSSA was an option contract, Daewoo did specifically argue that it did not enter into any shipbuilding contracts relating to Qatargas III until after the expiration of the contract between Daewoo and ikanco.

liquidated damages in the event such capacity was not utilized, could fulfill the parties' expectations to "secure the Project."

Had the parties intended that only a binding sales contract could "secure" the project, they could have so specified in the agreement itself. *See Banner Life Ins. Co. v. Pacheco*, 154 S.W.3d 822, 827-29 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (considering fact insurance policy did not specifically require a delivery receipt when parties could have included such language); *Perlstein v. D. Steller 3, Ltd.*, 109 S.W.3d 36, 41 (Tex. App.—Corpus Christi 2003, pet. denied) (observing that had parties intended to merge two agreements they could have "easily said so" in the agreements); *B.F. Goodrich Co. v. McCorkle*, 865 S.W.2d 618, 621 (Tex. App.—Houston [14th Dist.] 1993, no writ) (rejecting one party's interpretation of contract in part because, had the parties intended the contract to be subject to arbitration, they could have expressly stated so therein). Daewoo and ikanco, however, did not use "sale," "contract for sale," "binding contract," or similar terms to define in their agreement what had to occur in order for ikanco to be entitled to compensation. They instead chose the more open-ended phrase "secure the Project."[9]

The LSSA granted an "irrevocable option" to purchase certain types of vessels, set forth the default terms for such purchases, detailed the types of ships to be built, set order dates, reserved shipbuilding capacity at one of Daewoo's shipyards, and provided for liquidated damages (up to $71 million) to Daewoo in the event a certain number of ships were not purchased.[10] As Daewoo emphasizes, however, the LSSA still required the options to be exercised before ships would be built under its framework.[11]

---

[9] "Secure" has a range of possible definitions indicating degrees or types of procuring, obtaining, effecting, ensuring, and guaranteeing. *See Webster's Third New International Dictionary* 2053.

[10] Under Schedule H of the LSSA, it was agreed that a minimum of eleven vessels would be purchased, and in the event at least eleven were not purchased, liquidated damages were specified on a sliding scale depending on how many ships were actually purchased. If zero ships were purchased, the damages were specified at $71 million.

[11] Daewoo cites *Struller v. McGree* for the proposition that "the grant of an option constitutes neither a sale of property nor an agreement to sell." 374 S.W.2d 256, 258 (Tex. App.—San Antonio 1963, writ ref'd n.r.e.). However, under the facts of this case, where the Project need only be "secured,"

11

ConocoPhillips signed the LSSA as a member of the consortium, authorizing Qatargas Operating Company to represent its interests regarding to the options.

Although Daewoo urged this court to consider the surrounding circumstances, including industry custom, to inform our interpretation of the term "for" in the agreement, it does not do so for the term "secure." Indeed, Daewoo does not cite any evidence regarding how the surrounding circumstances, such as typical procedures in the shipbuilding industry, might inform the interpretation of "secure the Project." [I]kanco, on the other hand, argues that, after signing the LSSA, Daewoo itself publicly stated that it had "secured" a contract to build ships for Qatari gas projects, including Qatargas III. Although such evidence cannot be considered to create ambiguity where ambiguity does not otherwise exist, it can be considered as evidence of what it means in the shipbuilding industry to "secure" a shipbuilding project. *See Houston Exploration Co.*, 352 S.W.3d at 469 (explaining parol evidence rule does not prohibit consideration of the commercial context in which a contract was executed to inform the interpretation of a contract); *id.* at 474 (Jefferson, C.J., dissenting) (explaining that majority believed industry custom governed interpretation of contract but opining that no evidence of such a custom was presented in that case). Evidence that "securing" a project in the shipbuilding industry means the signing of a contract such as the LSSA is an indication it was reasonable to interpret the agreement between Daewoo and ikanco as providing for compensation to ikanco under these circumstances.[12]

Given the lack of precise definition in the agreement itself and the evidence that executing the LSSA "secured the Project" as that concept would be understood in the shipbuilding industry, we find that the agreement was ambiguous regarding what needed to happen before ikanco was entitled to compensation. Because there was more than one

---

the *Struller* holding does not factor into our analysis.

[12] At trial, Tae-Jin Hwang, an executive vice president of Daewoo, testified by deposition that the purpose of the LSSA was "to allow the shipbuilders to secure commitments for the building of numerous ships and for the purchasers to guarantee that ship supply and ship capacity would be available." This testimony further supports the conclusion that a contract such as the LSSA is considered sufficient to "secure" a project in the shipbuilding industry.

reasonable interpretation of "securing the Project" under the terms of the agreement, the trial court did not err in submitting interpretation of the agreement to the jury. *See Ashford Partners, Ltd.*, 2012 WL 1370847, at *3. Consequently, we overrule Daewoo's first issue.[13]

We affirm the trial court's judgment.

/s/    Martha Hill Jamison
        Justice

Panel consists of Chief Justice Hedges and Justices Jamison and McCally.

---

[13] Because we find that interpretation of the ambiguous agreement was properly submitted to the jury, we need not consider Daewoo's additional argument that the agreement was a broker contract and thus time was of the essence as a matter of law. Daewoo argued that the shipbuilding contract executed approximately six months after the end of the contract term did not entitle ikanco to compensation.