**Motion for Rehearing Granted in Part and Denied in Part; Affirmed in Part and Reversed and Remanded in Part; Opinion and Concurring Opinions filed October 16, 2012 Withdrawn, and Substitute Opinion and Substitute Concurring Opinions filed December 28, 2012.**



**In The**

# 𝕱𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝕮𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

---

## NO. 14-10-00604-CV

---

**2001 TRINITY FUND, LLC, Appellant**

**V.**

**CARRIZO OIL & GAS, INC., Appellee**

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2008-05053**

---

### S U B S T I T U T E   O P I N I O N [1]

Two oil and gas companies, an operator and a non-operator, signed an

---

[1] To the extent that we change the analysis and judgment regarding the attorney's fees awarded to Carrizo Oil & Gas, Inc. and to the extent that we affirm part of the trial court's judgment, we grant Carrizo's motion for rehearing, though we do not agree with all of Carrizo's arguments in support of this relief; otherwise, we deny the rehearing motion. We withdraw the opinion issued in this case on October 16, 2012, and issue this opinion in its place. This substitute opinion is the unanimous opinion of the court as to sections IV.B., IV.C., IV.D., and IV.E (addressing issues pertaining to the quantum-meruit claim, the promissory-estoppel claim, attorney's fees, and the appropriate appellate judgment). It is a plurality opinion as to section IV.A., with two justices concurring in the judgment only as to this part.

agreement setting forth the terms and conditions of the non-operator's participation in certain wells being drilled or to be drilled on some of the operator's Barnett Shale drilling prospects. After that agreement terminated automatically, the two companies exchanged a series of emails. The jury found that the companies agreed in writing to continue under the terms of the terminated agreement without the automatic-termination provision and with a new provision under which the non-operator would receive a 1% rebate. The jury found that the non-operator's breach of this contract resulted in damages to the operator. The jury also answered liability and damage questions favorable to the operator on alternative claims for quantum meruit and promissory estoppel. The trial court rendered judgment in favor of the plaintiff based upon the breach-of-contract claim. We conclude the evidence is legally insufficient to support the jury's liability findings regarding all three claims. Based upon the form of the trial court's judgment, we are precluded from effectively rendering judgment or affirming the trial court's judgment as modified. Therefore, after affirming part of the trial court's judgment that is not challenged on appeal, we sever and reverse the remainder of the judgment and remand to the trial court for rendition of a new judgment in which the non-operator recovers a money judgment against the operator.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee/plaintiff Carrizo Oil & Gas, Inc. had various leases in the Barnett Shale and was either drilling or planning to drill wells to keep certain of these leases from expiring. Appellant/defendant 2001 Trinity Fund, LLC was interested in participating in certain of Carrizo's Barnett Shale drilling prospects. Carrizo and Trinity entered into the "Barnett Shale Participation Agreement" on October 10, 2007 (hereinafter "Participation Agreement"). In pertinent part, the Participation Agreement provides as follows:

2

- Subject to the provisions of the Participation Agreement, Trinity has the potential to earn a portion of Carrizo's leasehold rights and interest in and to various leases described in the Participation Agreement. (article 1.5).

- Carrizo will drill and Trinity will commit to participate in nineteen wells specified in article 2.2 of the Participation Agreement ("Commitment Wells") before the expiration date of the relevant leases, so as to prevent the expiration of the leases. (article 2.1).

- Carrizo will provide the drilling rig for the two Commitment Wells on the Blair-Pickering Prospect. For the remaining wells, "Trinity shall provide the drilling rig with specifications approved in advance by Carrizo's Chief Operations Officer." "Carrizo reserves the right to utilize its own drilling rig for any wells drilled hereunder in the event that the drilling rig provided by Trinity does not meet with Carrizo's approval." (article 2.3).

- All Commitment Wells drilled under the Participation Agreement will be on the cost basis specified in the Participation Agreement, in which a certain cost percentage is allocated to Trinity as to each prospect area in which the Commitment Wells are to be drilled. (article 2.8(a)).

- "[P]ayment by Trinity for its respective share of drilling and casing costs for [the] first well on the Blair-Pickering Prospect shall be received by Carrizo on or before October 19, 2007, or this Agreement shall automatically terminate." (article 2.8(b)).

- "If Trinity has complied with all requirements, conditions and obligations of this Agreement, then Trinity shall earn the following right, title and interest in the Leases with respect to each Earning Well in a Prospect Area: [interests specified]." (article 3.1(c)).

- Within thirty days after Trinity has earned its respective working interest in the leases attributable to a Commitment Well, Carrizo shall prepare, execute, and deliver to Trinity an assignment of that interest. (article 3.2).

- "Time is of the essence under this Agreement. Thus, all time limits shall be strictly construed and enforced." (article 7.3).

- "If Trinity has not complied with each and all of the provisions of this

3

Agreement, then (i) Carrizo shall be relieved of its obligations to make the assignment(s) specified herein and (ii) Trinity shall have no further rights to earn additional rights hereunder or to undertake additional operations hereunder." (article 7.3).

- Trinity's failure to pay Carrizo Trinity's respective share of drilling and casing costs for the first well on the Blair-Pickering Prospect on or before October 19, 2007, is a failure to comply with the Participation Agreement causing automatic termination of the agreement, but such a failure is not an active and material breach of the Participation Agreement. (article 9.5).

- "This instrument contains the final and entire agreement of [Carrizo and Trinity] with respect to the matters covered by this Agreement and supersedes all prior communications and agreements (written, oral or otherwise) in this regard." (article 9.11).

Trinity did not pay its respective share of the drilling and casing costs for the first well on the Blair-Pickering Prospect on or before October 19, 2007. Thus, under article 2.8(b), the Participation Agreement automatically terminated at the end of the day on October 19, 2007. Evidence at trial indicated that one of the reasons Trinity gave for not making this payment related to article 2.3 of the Participation Agreement. There was evidence that Trinity expected, under this article, to provide the rig for drilling of all the Commitment Wells to be drilled, except for the two Commitment Wells on the Blair-Pickering Prospect. But Trinity learned that Carrizo preferred to use its rigs to drill all of the Commitment Wells and that Carrizo planned to not approve any Trinity rig and to invoke its right under article 2.3 of the Participation Agreement to use Carrizo drilling rigs.

Between October 31, 2007, and January 2, 2008, David Friedman, on behalf of Carrizo, and Rob Arrowood, on behalf of Trinity, exchanged a series of emails that, according to Carrizo, constituted a written agreement by Carrizo and Trinity to continue under the terms of the Participation Agreement without a termination date associated with the non-payment of costs for the first well on the Blair-

4

Pickering Prospect and with a new provision under which Trinity would receive a 1% rebate (hereinafter "Alleged Agreement"). Carrizo alleges that Trinity breached this Alleged Agreement by not paying Carrizo any amount for the costs of any of the Commitment Wells.

Carrizo and Trinity have entered into contracts regarding various matters other than the subject matter of the Participation Agreement. Carrizo and Trinity entered into a participation agreement regarding various oil and gas leases in Denton County, Texas ("Denton County Agreement"). On January 21, 2008, Arrowood sent a letter to Carrizo in a purported attempt to resolve various disputes that had developed between Trinity and Carrizo. These disputes were not resolved, and one week later Carrizo filed suit in the trial court below. Eventually, Carrizo asserted claims against Trinity for breach of contract, quantum meruit, and promissory estoppel. Carrizo also asserted breach-of-contract and declaratory-judgment claims against Trinity based upon the Denton County Agreement. Trinity filed counterclaims, seeking declaratory relief regarding both the Participation Agreement and the Denton County Agreement and seeking damages resulting from Carrizo's alleged breaches of the Denton County Agreement.

The trial court denied various summary-judgment motions, including Trinity's motion for summary judgment as to Carrizo's breach-of-contract and quantum-meruit claims relating to the subject matter of the Participation Agreement. The case proceeded to trial before a jury. The jury found that (1) Carrizo and Trinity agreed to the Alleged Agreement and that this agreement was in writing and signed; (2) Trinity failed to comply with the Alleged Agreement; (3) $10,894,000 would fairly and reasonably compensate Carrizo for its damages resulting from this failure to comply; (4) Carrizo rendered valuable services or furnished materials for Trinity, who knowingly accepted and used these services and materials, and Trinity should have known that Carrizo expected to be paid for

5

the work; (5) the reasonable value of these services and goods was $10,894,000; (6) Carrizo substantially relied to its detriment on Trinity's promise concerning the Barnett Shale Drilling Program and this reliance was foreseeable by Trinity; and (7) $10,894,000 would fairly and reasonably compensate Carrizo for its damages resulting from its reliance on Trinity's promise. The jury also made findings regarding Trinity's claims relating to the Denton County Agreement and regarding each party's reasonable and necessary attorney's fees.

Trinity asked the trial court to disregard the jury's findings as to Carrizo's claims against Trinity for money damages. Nonetheless, the trial court rendered judgment on the jury's verdict. The trial court concluded that Trinity was indebted to Carrizo in the amount of $12,070,549 ($10,894,000 plus prejudgment interest). The trial court rendered declaratory relief regarding the Denton County Agreement consistent with the jury's findings. Based upon the jury's findings, the trial court also determined that Carrizo is indebted to Trinity in the amount of $404,159.92 under the Denton County Agreement. The trial court further concluded that Trinity was indebted to Carrizo in the amount of Carrizo's reasonable and necessary fees as found by the jury and that Carrizo was indebted to Trinity in the amount of Trinity's reasonable and necessary fees as found by the jury. After offsetting these amounts and taking into account an offset that Carrizo had made against certain obligations to Trinity, the trial court rendered a judgment in Carrizo's favor for the net amount. In its judgment, the trial court did not determine that Trinity owned any interest in the leases covered by the Participation Agreement; however, the court did state that "Carrizo's obligation to pay Trinity any revenue derived from the Wells drilled under the terms of the [Participation Agreement] . . . is controlled by the terms of the [Participation Agreement]." The language used in the final judgment shows that the trial court rendered judgment based upon the jury's

6

findings regarding the breach-of-contract claim rather than the quantum-meruit claim or the promissory-estoppel claim.

## II. ISSUES PRESENTED

Trinity has appealed the trial court's judgment; Carrizo has not appealed. Trinity presents the following issues:

(1)     The trial court erred in denying Trinity's summary-judgment motions regarding Carrizo's breach-of-contract claim.

(2)     The trial court should not have submitted the breach-of-contract claim to the jury.

(3)     The evidence is legally insufficient, or in the alternative factually insufficient, to support the jury's verdict on Carrizo's breach-of-contract claim.

(4)     The trial court erred in denying Trinity's summary-judgment motions regarding Carrizo's quantum-meruit claim.[2]

(5)     The trial court should not have submitted the quantum-meruit claim to the jury.

(6)     The evidence is legally insufficient, or in the alternative factually insufficient, to support the jury's verdict on Carrizo's quantum-meruit claim.

(7)     The trial court should not have submitted Carrizo's promissory-estoppel claim to the jury.

(8)     The evidence is legally insufficient, or in the alternative factually insufficient, to support the jury's verdict on Carrizo's promissory-estoppel claim.

(9)     In the alternative, the damages awarded to Carrizo on its promissory-estoppel claim should be reduced.

(10)    The evidence does not support the trial court's award of attorney's fees to Carrizo.

## III. STANDARD OF REVIEW

---

[2] Trinity numbers its issues separately for each claim. For ease of reference, we have numbered the issues from first to tenth in the order in which Trinity lists them in its brief.

On appeal, Trinity challenges the legal sufficiency of the evidence supporting various jury findings. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The jury is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

## IV. ANALYSIS

### A. Is the evidence legally sufficient to support the jury's finding that Carrizo and Trinity entered into the Alleged Agreement?

Under its second issue, Trinity asserts that the trial court erred in submitting Question 1 to the jury over Trinity's objection that the evidence was legally insufficient to support the submission of this question to the jury. Under its third issue, Trinity asserts that the evidence is legally insufficient to support the jury's finding in response to Question 1 that Carrizo and Trinity entered into the Alleged Agreement. Thus, in both issues Trinity challenges the legal sufficiency of the evidence to support an affirmative answer in response to Question 1. In this question, the trial court asked the jury whether Carrizo and Trinity "agree[d] to continue with the [Participation Agreement] without a termination date associated with the non-payment of costs for the first well on the Blair-Pickering prospect and with a 1% rebate payable to Trinity." The trial court also instructed the jury that an agreement concerning the transfer of an interest in minerals must be in writing and signed. Because the Participation Agreement, with the modifications stated in

8

Question 1, is an agreement concerning the transfer of an interest in minerals, the jury found that the Alleged Agreement that the parties entered into was in writing and signed.[3] Thus, the jury found that Carrizo and Trinity entered into a written agreement to continue with the Participation Agreement without a termination date associated with the non-payment of costs for the first well on the Blair-Pickering prospect and with a 1% rebate payable to Trinity. At the charge conference, no party objected to the form of Question 1; therefore, this court measures the sufficiency of the evidence using the language of this question and the instructions associated with it, even if they do not correctly state the law. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding that appellate court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard).

In its live petition, Carrizo pleaded that the Participation Agreement terminated when Trinity did not pay its respective share of the drilling and casing costs for the first well on the Blair-Pickering Prospect on or before October 19, 2007. Trinity agrees with this proposition, and it is correct under the unambiguous language of the Participation Agreement and the uncontroverted evidence that Trinity did not make this payment. The jury was not asked to determine whether Trinity failed to comply with the Participation Agreement; rather, the jury was asked whether Trinity failed to comply with the Alleged Agreement. In response to Question 1, the jury found that Carrizo and Trinity agreed to the terms of the

---

[3] The trial court also instructed the jury regarding the Uniform Electronic Transactions Act. *See* Tex. Bus. & Com. Code Ann. § 322.001, *et seq.* (West 2012). The jury impliedly found that the parties agreed to enter into the Alleged Agreement by electronic means and that Arrowood and Friedman executed or adopted a symbol associated with their respective emails with the intent to sign the emails. Trinity has challenged the legal sufficiency of these findings, but it is unnecessary to address these challenges in this opinion.

Alleged Agreement. To create an enforceable contract, there must be (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *See Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "Meeting of the minds" describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract. *See Potcinske v. McDonald Property Investments, Ltd.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007, no pet.) Mutual assent concerning material, essential terms is a prerequisite to formation of a binding contract. *See id*.

The only possible basis for the jury's finding that the parties entered into the Alleged Agreement is a series of emails exchanged by Friedman and Arrowood between October 31, 2007, and January 2, 2008. These emails will now be discussed in chronological order.

On October 31, 2007, Friedman sent an email to Arrowood (1) stating that Brad Fisher of Carrizo was uncomfortable with using a Trinity rig to drill any wells, (2) indicating that Carrizo was unwilling to use any of Trinity's drilling rigs, and (3) stating that Carrizo realized that the use of Trinity's rigs represented a part of the compensation Trinity expected from the parties' agreement. In an effort to compensate Trinity for the failure to use any of its rigs, Friedman suggested "amending" the Participation Agreement "to provide that Carrizo pay a full 1% more in costs on each of the wells that [Trinity] would have used [its] own rig," which Friedman stated were the wells on four of the seven prospects listed in the Participation Agreement. Friedman stated that all other terms of the Participation Agreement would remain the same.

10

On November 2, 2007, Arrowood emailed Friedman saying, "I accept in principle but need to have this interest flow directly back to me." Arrowood stated that he had agreements with his investors and that he was not planning on including them in the compensation received from the use of Trinity's rigs. Arrowood stated that "[t]he compensation on the rigs was going directly to me." Arrowood asked Friedman if he could figure out a way to have the additional compensation go directly to him. On the same day, Friedman responded that "[w]hat we can do is send a 1% rebate for each well directly to you." Friedman stated that, "[i]f you are in agreement in principle, then I'm assuming we can work out the mechanics." Friedman told Arrowood that Carrizo needed to know that day whether Trinity planned to pay Carrizo and exactly when it planned to pay. Arrowood responded that day with the following two sentences: "That will work. I will try to call before the day is over and give you an exact time."

Three days later, on November 5, 2007, Friedman emailed Arrowood asking him to provide a final answer on that day as to whether and when Trinity planned to pay Carrizo. Friedman stated that "[a]fter today it will be out of my hands." Arrowood responded: "Yes, has been my final answer. I will give you the final date asap. I am waiting on a couple more executed documents and will proceed with all payments." Friedman responded, "[w]e need a definitive payment date now." Friedman also stated that Carrizo needed to receive a wire transfer by the next day "in order to keep this agreement alive." Friedman reiterated that after that day, it would be "out of his hands." Arrowood responded that "[i]t was just [November 2, 2007,] that we agreed to a supplement to this agreement that **you** changed last minute [sic]." Arrowood stated that if Carrizo wanted Trinity to submit the funds, then Carrizo had to wait until Trinity had all of the executed documents between Trinity and its investors. Arrowood asked for certain exhibits that he said he needed to attach to Trinity's agreement with its investors.

11

Friedman responded the next day on November 6, 2007, angrily accusing Trinity of having had no intention to pay Carrizo all along and complaining that Trinity was always blaming its problems on Carrizo. The next email in evidence is dated one month later on December 7, 2007, from Arrowood to Friedman. In this short email Arrowood claims that his "funding is finally in." Nonetheless, no payment was forthcoming from Trinity to Carrizo.

On December 12, 2007, counsel retained by Carrizo sent a letter to Trinity demanding payment of the Trinity's respective share of the drilling and casing costs for the first well on the Blair-Pickering Prospect under the Participation Agreement. In this letter, counsel for Carrizo demanded that Trinity pay these costs and other sums by December 20, 2007. Carrizo stated that if Trinity did not pay its respective share of the drilling and casing costs for the Blair-Pickering wells by that date, Carrizo intended to exercise all rights and remedies available to it, including filing suit against Trinity to recover the amounts due to Carrizo under the Participation Agreement. In the demand letter, Carrizo does not mention the Alleged Agreement.

On December 14, 2007, Arrowood sent an email to Friedman stating that his attorney would have "the agreement" ready by December 18 and that once the agreement was executed, Arrowood would "forward funds." On December 18, 2007, Arrowood sent Friedman a draft of a document amending the Participation Agreement, asking Friedman to review the document and advise if he wanted to make any changes. The next day, Friedman responded that Carrizo was analyzing Trinity's proposed agreement and noted that the compensation specified in the proposed agreement was "different from the compensation we agreed to with you on 11/2/07." The evidence indicates that, sometime between December 19, 2007, and December 30, 2007, Carrizo sent Trinity a draft of a document amending the Participation Agreement. This document was lost and is not in our record. On

12

December 30, 2007, Carrizo sent Trinity a different draft of a "First Amendment to Barnett Shale Participation Agreement" and asked Trinity to disregard the previous draft. Carrizo asked that, by January 4, 2008, Trinity (1) execute the proposed amendment to the Participation Agreement, (2) wire to Carrizo the amount corresponding to Trinity's respective share of the drilling and casing costs for the Blair-Pickering wells, and (3) make secure arrangements for payment of Trinity's share of all other costs for the other Commitment Wells. Three days later, Carrizo forwarded a copy of the "First Amendment to Barnett Shale Participation Agreement" that was signed by Carrizo. Trinity never executed this document, nor did it ever pay Carrizo any amount for the costs of any of the Commitment Wells.

Under the unambiguous language used by Friedman and Arrowood in this series of emails, there was no mutual understanding and assent by Carrizo and Trinity to a written agreement to continue with the Participation Agreement without a termination date associated with Trinity's failure to pay the costs for the first well on the Blair-Pickering Prospect on or before October 19, 2007. Under a single sentence in article 2.8(b) of the Participation Agreement, the parties agreed that Trinity's payment of its respective share of drilling and casing costs for the first well on the Blair-Pickering Prospect would be received by Carrizo on or before October 19, 2007, and if payment was not received by this date, then the Participation Agreement would automatically terminate. Because this payment was not received, the Participation Agreement terminated at the end of the day on October 19, 2007. Significantly, by not paying these costs by October 19, 2007, Trinity failed to comply with a provision of the Participation Agreement. Therefore, under the unambiguous language of article 7.3 of the agreement, Carrizo was relieved of its obligations to assign Trinity any interest in the Commitment Wells, and Trinity had no further ability to earn additional rights in any lease with respect to a Commitment Well or to undertake additional operations

13

under the Participation Agreement. Because Trinity had not earned or obtained any interest in any lease related to any Commitment Well on or before October 20, 2007, Trinity's failure to pay the costs under article 2.8(b) meant that, under the terms of the Participation Agreement, Trinity had no such interest and was not entitled to receive such an interest in the future. On the other hand, because the Participation Agreement had terminated, no further obligation to pay costs could accrue to Trinity under the Participation Agreement.

If, after October 19, 2007, the parties were to agree to continue forward under the terms of the Participation Agreement without the automatic termination due to Trinity's failure to timely pay the costs under article 2.8(b) and without any change to articles 3.1(c) and 7.3, then Trinity would be obligating itself to pay millions of dollars in costs, but would have no ability to earn or receive any interest in any lease relating to the Commitment Wells. Continuing forward with the Participation Agreement without a termination date raises various issues, such as: (1) whether the due date for Trinity's cost payment regarding the Blair-Pickering Prospect would be on October 19, 2007, and therefore be considered as past due, (2) if the payment would still be considered past due, whether articles 3.1(c) and 7.3 should be changed so that Trinity would still have a potential ability to earn and receive an interest in the leases related to the Commitment Wells, and (3) whether the due date for Trinity's cost payment regarding the Blair-Pickering Prospect would be changed to a future date so that the payment might be made timely by Trinity. None of these issues are addressed in writing in the series of emails between Friedman and Arrowood.

In Friedman's October 31, 2007 email, he proposes a change to the allocation of costs under the Participation Agreement, and then unambiguously states that all other terms of the Participation Agreement would remain the same.

14

Under the unambiguous terms of this proposal, the termination date in article 2.8(b) would not be removed, nor would articles 3.1(c) and 7.3 be changed so that Trinity would still have a potential ability to earn and receive an interest in the leases related to the Commitment Wells. In response, Arrowood says that he accepts in principle, but needs to materially change the nature of the potential new compensation. Thus, Arrowood shows that agreement in principle does not mean that the parties have reached agreement on all material terms.

Friedman then responds with a change in the potential new compensation to Trinity. Friedman does not reiterate the full terms of his proposal. Presuming that he is proposing the same terms as before except with the change to the method of potential compensation, then under the unambiguous terms of this proposal, the termination date in article 2.8(b) would not be removed, nor would articles 3.1(c) and 7.3 be changed. Friedman says, "[i]f you are in agreement in principle, then I'm assuming we can work out the mechanics." Both under the plain meaning of "agreement in principle" and as already shown by Arrowood in a prior email, an agreement in principle is not an agreement as to all material terms. Indeed, Friedman specifically says that, even with an agreement in principle, "the mechanics" still need to be "work[ed] out." In response to this proposal, Arrowood said, "[t]hat will work." Presuming that Arrowood was saying that he agreed in principle with Friedman, the statements in these emails do not constitute a written agreement to continue with the Participation Agreement without a termination date associated with Trinity's failure to pay the costs under article 2.8(b). In addition, even if Arrowood were deemed to have accepted Friedman's prior offer, as discussed above, that offer unambiguously stated that all other terms of the Participation Agreement would remain the same, which would mean that article 2.8(b) was not changed.

On November 5, 2007, Friedman again asked Trinity if and when it would pay its share of the costs relating to the Blair-Pickering Prospect. Friedman did not reach an agreement with Arrowood as to when Trinity promised to pay these costs; rather, he simply asked when and if Trinity would pay them. In response, Arrowood stated "Yes, has been my final answer." He stated that, as soon as possible, he would tell Carrizo the date on which Trinity would make the payment. He indicated that Trinity was waiting to execute documents with its investors and that payment would be forthcoming after these documents were executed. In response, Friedman stated that Trinity must wire funds to Carrizo by November 6, 2007, "in order to keep this agreement alive." Significantly, the parties had not agreed in writing that Trinity had to make a payment by November 6, 2007, so this ultimatum from Carrizo also shows that there has been no agreement in writing to the Alleged Agreement. In response, Arrowood states that on November 2, 2007, the parties "agreed to a supplement to this agreement," but in the context of this series of emails, this statement appears to refer to an agreement in principle. In any event, a conclusory statement that the Participation Agreement was supplemented does not raise a fact issue as to whether the parties agreed to continue with the Participation Agreement without a termination date associated with Trinity's failure to pay the costs under article 2.8(b). *See Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (stating that conclusory testimony does not raise a fact issue); *Dolcefino v. Randolph*, 19 S.W.3d 906, 930 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (explaining that conclusory statement are insufficient to raise a fact issue). In the very next sentence, Arrowood says that he cannot forward the funds until he has received all of the executed documents from his investors. There was no written agreement as to when Trinity promised to make this payment.

16

After Trinity continued not to pay any costs, counsel for Carrizo sent a demand letter to Trinity based upon the Participation Agreement and not based upon any Alleged Agreement entered into by email. Shortly thereafter, Trinity sent a draft of written amendment to Carrizo that did not have the same terms as those discussed by email. In response, Carrizo sent a draft of a "First Amendment to Barnett Shale Participation Agreement." That draft does not refer to the parties having agreed to a prior amendment to the Participation Agreement, and it is drafted as if it is the first amendment to the Participation Agreement. The terms of that amendment are different from the terms of Trinity's proposed draft and also contain terms not stated in the series of emails.

Carrizo asserts that whether the parties agreed to the Alleged Agreement is a fact issue for the jury's determination. But the negotiations, alleged offers, and alleged acceptances in the case under review are in writing and the language of these writings is unambiguous. In this situation, whether the parties agreed to the Alleged Agreement is a question of law. *See Antonini v. Harris Cnty. Appraisal Dist.*, 999 S.W.2d 608, 610–11 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Gilbert v. Pettiette*, 838 S.W.2d 890, 893 (Tex. App.—Houston [1st Dist.] 1992, no writ).

Carrizo also relies upon *Preston Farm and Ranch Supply, Inc. v. Bio-Zyme Enterprises*. *See* 625 S.W.2d 295, 296–98 (Tex. 1981). That case involved an implied-in-fact contract under section 2.204 of the Uniform Commercial Code based upon a course-of-dealing between merchants. *See* Tex. Bus. & Com. Code Ann. § 1.303(b) (West 2012) (defining "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct"); *id*. § 2.204

17

(West 2012); *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 296–99. The case under review does not involve an alleged implied-in-fact contract or an alleged contract for the sale of goods between merchants. In addition, Carrizo has not cited any evidence of a sequence of conduct between Carrizo and Trinity concerning previous transactions that would fairly be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct in the transaction at issue in the case under review. *See* Tex. Bus. & Com. Code Ann. § 1.303(b); *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 296–99. The *Preston Farm and Ranch Supply* case is not on point.

Carrizo cites *Adams v. Abbott*. *See* 254 S.W.2d 78, 78–79 (Tex. 1952). In that case, the Supreme Court of Texas found a meeting of minds based upon a series of letters. *See id.* Though that case involved the formation of an agreement by a series of letters, the facts of that case are not the same as those in the case under review, and that case does not control the disposition of Trinity's second and third issues. *See id.* Carrizo also cites *DeClaire v. G&B McIntosh Family Ltd. P'ship*. *See* 260 S.W.3d 34, 43–44 (Tex. App.—Houston [1st Dist.] 2008, no pet.). That case involved the acceptance of a promissory note by the payee of the note and is not on point in the case under review. Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the trial evidence would not enable reasonable and fair-minded people to find in response to Question 1 that Carrizo and Trinity agreed in writing to the Alleged Agreement.[4]

---

[4] In his substitute concurring opinion, Justice Seymore cites two cases involving issues as to whether the trial court properly submitted the interpretation of a written contract to the jury. *See Daewoo Shipbuilding & Marine Engineering, Co., v. Ikanco Inc.*, 376 S.W.3d 229, 233–38 (Tex. App.—Houston [14th Dist.] 2012, pet. granted, judgm't vacated w.r.m.); *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627 n.2, 632 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

*See City of Keller*, 168 S.W.3d at 823, 827; *Parker Drilling Co.*, 316 S.W.3d at 72–73; *The Levin Law Group, P.C. v. Sigmon*, No. 14-08-01165-CV, 2010 WL 183525, at *3–5 (Tex. App.—Houston [14th Dist.] Jan. 21, 2010, pet. denied) (mem. op.); *Antonini*, 999 S.W.2d at 610–11; *Lewis v. Adams*, 979 S.W.2d 831, 833–34 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

Accordingly, Trinity's second issue and the part of the third issue in which Trinity challenges the legal sufficiency of the evidence supporting the jury's finding in response to Question 1 are sustained.[5] Therefore, it is unnecessary to address the remainder of the third issue in which Trinity challenges the factual sufficiency of the evidence.

**B.    Is the evidence legally sufficient to support the jury's quantum-meruit finding?**

Under its fifth and sixth issues, Trinity asserts that the evidence is legally

---

Though the unambiguous emails are the only potential evidence that Carrizo and Trinity agreed in writing to the Alleged Agreement, it is significant to note that Question 1 did not submit to the jury the interpretation of any agreement. Rather, Question 1 asked the jury to determine whether the parties agreed in writing to the Alleged Agreement. Trinity did not object to the submission of Question 1 on the ground that the emails are unambiguous and that the trial court should not ask the jury to interpret the emails. In addition, in the *XCO Production Company* case, the appellant did not challenge the legal sufficiency of the evidence to support the jury's interpretation of the contract; the appellant challenged only the submission of the interpretation issue to the jury. *See XCO Prod. Co.*, 194 S.W.3d at 627 n.2. Trinity's assertion that the trial court erred in submitting Question 1 over Trinity's objection that the evidence was legally insufficient to support the submission of this question is an issue regarding the legal sufficiency of the evidence to support an affirmative answer in response to Question 1. These two cases do not suggest otherwise.

[5] It is not necessary to address Trinity's argument that the evidence is legally insufficient to support the jury's finding that the parties agreed to enter into the Alleged Agreement by electronic means and that Arrowood and Friedman executed or adopted a symbol associated with their respective emails with the intent to sign the email. *See* Tex. Bus. & Com. Code Ann. §§ 322.002, 322.007 (West 2012) (provisions of the Uniform Electronic Transactions Act parts of which were submitted to the jury in Question 1). In addition, it is unnecessary to address Trinity's argument that the statute of frauds bars enforcement of the Alleged Agreement as a matter of law.

insufficient to support the jury's quantum-meruit finding in response to Question 4. The trial court did not render judgment based upon Carrizo's quantum-meruit claim. If, on original submission, the parties brief issues relating to the plaintiff's election of alternative theories of recovery under the *Boyce Iron Works* case, this court may address these issues on original submission. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal"); *Hatfield v. Solomon*, 316 S.W.3d 50, 60 n.3 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (stating that *Boyce Iron Works* election of alternative theory of recovery may be addressed on original submission if briefed by the parties). We conclude that Carrizo has briefed conditional *Boyce Iron Works* elections in its appellee's brief based upon the quantum-meruit and promissory-estoppel findings by the jury. In appellate briefing, Trinity has asserted and briefed challenges to these jury findings. Therefore, we will address these *Boyce Iron Works* elections by Carrizo. *See Hatfield*, 316 S.W.3d at 60 n.3.

In response to Question 4, the jury found that (1) Carrizo rendered valuable services or furnished materials for Trinity, who knowingly accepted and used these services and materials, and (2) Trinity should have known that Carrizo expected to be paid for the work. At the charge conference, no party objected to the form of Question 4; therefore, we measure the sufficiency of the evidence using the language of this question and the instructions associated with it, even if they do not correctly state the law. *See Osterberg*, 12 S.W.3d at 55.

Under this question and under Texas law, to recover in quantum meruit, Carrizo must show that it rendered valuable services or furnished materials *for*

20

Trinity; it is not enough to show that Carrizo rendered valuable services or furnished materials that benefitted Trinity. *See Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988); *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985). The evidence shows that Carrizo owned leasehold rights and interests in and to oil, gas, and mineral leases relating to the prospects listed in the Participation Agreement and that those leases were to expire in the near future unless Carrizo began or caused to begin the drilling of a well. As discussed above, under the unambiguous language of article 7.3 of the Participation Agreement, Trinity's failure to pay the costs under article 2.8(b) on or before October 19, 2007, relieved Carrizo of any obligation to assign Trinity an interest in the Commitment Wells. In addition, Trinity's failure to pay these costs meant that Trinity had no further ability to earn additional rights in any lease with respect to a Commitment Well or to undertake additional operations under the Participation Agreement. Because Trinity had not earned or obtained any interest in any lease related to any Commitment Well on or before October 19, 2007, Trinity's failure to pay the costs under article 2.8(b) meant that, under the terms of the Participation Agreement, Trinity had no such interest and was not entitled to receive such an interest in the future. Because the Participation Agreement had terminated, no further obligation to pay costs could accrue to Trinity under the Participation Agreement. Furthermore, as discussed above there is legally insufficient evidence of the alleged post-termination written contract.

Carrizo points to the following language in the trial court's judgment: "Carrizo's obligation to pay Trinity any revenue derived from the Wells drilled under the terms of the [Participation Agreement] . . . is controlled by the terms of the [Participation Agreement]." Carrizo argues that, based upon this language, "Trinity now owns an interest in all the drilled wells." For the reasons stated

above, under the unambiguous language of the Participation Agreement, Trinity owns no such interest, and in its judgment the trial court states that Trinity has whatever interest it is entitled to under the Participation Agreement.

In sum, drilling the Commitment Wells directly benefited the interests of Carrizo, and Trinity had no interest in these prospects or leases that would be benefitted by the drilling of these wells. Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would not enable reasonable and fair-minded people to find in response to Question 4 that Carrizo rendered *valuable* services or furnished materials *for* Trinity, who knowingly accepted and used these services and materials. *See City of Keller,* 168 S.W.3d at 823, 827; *Truly*, 744 S.W.2d at 937; *Bashara*, 685 S.W.2d at 310; *Key Energy Servs., Inc. v. TBS Int'l, Inc.*, No. 11-05-00153-CV, 2006 WL 2507616, at *3 (Tex. App.—Eastland Aug. 31, 2006, no pet.) (mem. op.); *Aviall Servs., Inc. v. Cooper Indus., Inc.*, 694 F. Supp. 2d 567, 598–99 (N.D. Tex. Feb. 5, 2010) (applying Texas law). Accordingly, we sustain Trinity's fifth issue and the part of the sixth issue in which Trinity challenges the legal sufficiency of the evidence regarding the quantum-meruit claim. We do not address the remainder of the sixth issue in which Trinity challenges the factual sufficiency of the evidence.[6]

---

[6] In its first and fourth issues, Trinity challenges on appeal the trial court's denial of its summary-judgment motions regarding Carrizo's breach-of-contract and quantum-meruit claims. When a trial court's denial of a motion for summary judgment is followed by a trial on the merits, an appellate court cannot review the trial court's denial of summary judgment. *See Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *Houston v. Ludwick*, No. 14-09-00600-CV, 2010 WL 4132215, at *5 (Tex. App.—Houston [14th Dist.] Oct. 21, 2010, pet. denied) (mem. op.). Therefore, we do not address Trinity's first and fourth issues.

## C. Is the evidence legally sufficient to support the jury's promissory-estoppel finding?

Under its seventh and eighth issues, Trinity asserts that the evidence is legally insufficient to support the jury's promissory-estoppel finding in response to Question 6. The trial court did not render judgment based upon Carrizo's promissory-estoppel claim. But because the parties have briefed issues relating to the Carrizo's *Boyce Iron Works* election under this alternative theory of recovery, this court may address these issues on original submission. *See Boyce Iron Works, Inc.*, 747 S.W.2d at 787; *Hatfield*, 316 S.W.3d at 60 n.3.

In response to Question 6, the jury found that Carrizo substantially relied to its detriment on Trinity's promise concerning the Barnett Shale Drilling Program and this reliance was foreseeable by Trinity. At the charge conference, no party objected to the form of Question 6; therefore, we measure the sufficiency of the evidence using the language of this question and the instructions associated with it, even if they do not correctly state the law. *See Osterberg*, 12 S.W.3d at 55.

To recover under a promissory-estoppel theory, Carrizo must show a promise by Trinity concerning the Barnett Shale Drilling Program. As potential promises by Trinity, Carrizo points to two statements by Arrowood prior to the execution of the Participation Agreement: (1) "Yes, we are in." and (2) "As I told you before, I intend on being involved in the drilling program." In the Participation Agreement, Carrizo and Trinity agreed that "[t]his instrument contains the final and entire agreement of [Carrizo and Trinity] with respect to the matters covered by this Agreement and supersedes all prior communications and agreements (written, oral or otherwise) in this regard." Evidence of these two alleged promises is incompetent as a matter of law to show a promise under the

23

parol evidence rule and the integration clause of the Participation Agreement.[7] *See White Oak Operating Co., LLC v. BLR Constr. Cos., LLC*, 362 S.W.3d 725, 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (stating that that unobjected-to parol evidence is incompetent and has no probative value to change meaning of unambiguous written agreement); *Clear Lake City Water Auth. v. Friendswood Dev. Co., Ltd.*, 256 S.W.3d 735, 752 n.23 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd) (same as *White Oak Operating Co.*); *Gonzalez v. The United Brotherhood of Carpenters and Joiners of America, Local 551*, 93 S.W.3d 208, 211 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (holding promissory estoppel cannot be used to circumvent the parol evidence rule); *Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A.*, 956 S.W.2d 749, 757 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (same as *Gonzalez.*); *Stavert Props., Inc. v. Republicbank of Northern Hills*, 696 S.W.2d 278, 282 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (same as *Gonzalez.*).

After the Participation Agreement terminated, as discussed above, Arrowood sent emails to Friedman stating "[t]hat will work" and "[y]es, has been my final answer." We conclude that either alone or together these statements are too vague and indefinite to constitute a promise that would support a finding of promissory

---

[7] In arguing to the contrary, Carrizo cites to *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America. See* 341 S.W.3d 323, 331–36 (Tex. 2011). In that case, the Supreme Court of Texas held that language in a commercial lease, as a matter of law, did not constitute a clear and unequivocal expression of the tenant's intent to disclaim reliance so as to negate the reliance element of a fraudulent-inducement claim asserted by one of the parties. *See id.* The appeal under review does not involve a fraudulent-inducement claim or any alleged disclaimer of reliance regarding a fraud claim. In addition, the parol evidence rule does not apply to evidence of fraudulent inducement, but there is no exception to the parol evidence rule for promissory-estoppel claims. *See id.* at 331; *Gonzalez v. The United Brotherhood of Carpenters and Joiners of America, Local 551*, 93 S.W.3d 208, 211 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Thus, the *Italian Cowboy Partners* case is not on point.

estoppel.[8] *See Ellen v. F.H. Partners*, No. 03-09-00310-CV, 2010 WL 4909973, at *6 (Tex. App.—Austin Dec. 1, 2010, no pet.) (concluding that statement was too vague and indefinite as a matter of law to be enforced in a claim for promissory estoppel) (mem. op.); *Gilmartin v. KVTV–Channel 13*, 985 S.W.2d 553, 558–59 (Tex. App.—San Antonio 1998, no pet.) (same as *Ellen*); *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 568–70 (Tex. App.—Dallas 1989, no writ) (holding that promises to upgrade hospital facilities and level of patient care were too vague and indefinite as a matter of law to be enforced in a claim for promissory estoppel).

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would not enable reasonable and fair-minded people to find in response to Question 6 that Carrizo substantially relied to its detriment on Trinity's promise concerning the Barnett Shale Drilling Program and this reliance was foreseeable by Trinity. *See City of Keller*, 168 S.W.3d at 823, 827; *Ellen*, 2010 WL 4909973, at *6; *Gilmartin*, 985 S.W.2d at 558–59; *Gonzalez*, 93 S.W.3d at 211; *Highlands Mgmt. Co.*, 956 S.W.2d at 757; *Gillum*, 778 S.W.2d at 569–70. Accordingly, we sustain Trinity's seventh issue and the part of the eighth issue in which Trinity challenges the legal sufficiency of the evidence regarding the promissory-estoppel claim. We do not address the remainder of the eighth issue in which Trinity challenges the factual sufficiency of the evidence or the ninth issue. In addition, we need not address

---

[8] Even if, notwithstanding the parol evidence rule and the integration clause of the Participation Agreement, we could consider the two statements made before the parties signed the Participation Agreement, we would conclude that these two statements were too vague and indefinite to constitute a promise that would support a finding of promissory estoppel.

Trinity's argument that the statute of frauds bars enforcement of Carrizo's promissory-estoppel claim as a matter of law.

**D.** **Is the evidence insufficient to support the trial court's award of attorney's fees in favor of Carrizo?**

In its tenth issue, Trinity asserts that the evidence does not support the award of attorney's fees to Carrizo relating to the Participation Agreement claims. But, in its judgment, the trial court made a general award of attorney's fees to Carrizo, without limiting the fees to the Participation Agreement claims and without specifying the statutory basis for the award. In its live pleading, Carrizo sought declaratory relief regarding various matters relating to the Denton County Agreement and cited the Texas Declaratory Judgments Act generally. But Carrizo did not specifically cite Texas Civil Practice and Remedies Code section 37.009. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2012) (stating that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just"). Nonetheless, in its petition Carrizo sought to recover its "reasonable and necessary attorney's fees as are equitable and just." Based upon the facts and allegations pleaded in its petition, we conclude Carrizo requested attorney's fees under the Texas Declaratory Judgments Act. *See id.*; *Gottfried v. Gottfried*, No. 14-10-00645-CV, 2011 WL 5042483, at *4, n.7 (Tex. App.—Houston [14th Dist.] Oct. 25, 2011, pet. denied) (mem. op.).

In its final judgment, the trial court rendered various declarations relating to the Denton County Agreement. To show that the trial court erred in awarding attorney's fees to Carrizo, Trinity must show that this award was improper under Texas Civil Practice and Remedies Code section 37.009. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Gottfried*, 2011 WL 5042483, at *4, n.7; *Morrell Masonry Supply, Inc. v. Scott Griffin & Assocs., Inc.*, No. 01-09-01147-CV, 2011

26

WL 2089677, at *8–9 (Tex. App.—Houston [1st Dist.] May 19, 2011, no pet.) (mem. op.); *Cap Rock Elec. Cooperative, Inc v. Texas Util. Elec. Co.*, 874 S.W.2d 92, 102 (Tex. App.—El Paso 1994, no writ).

Trinity's main appellate argument regarding this attorney's fees award is that (1) Carrizo was not entitled to recover attorney's fees as to all of its claims; (2) Carrizo was required to segregate its attorney's fees so that there was evidence of reasonable and necessary fees only as to the claim for which Carrizo was entitled to recover attorney's fees; and (3) the evidence is insufficient to support the attorney's fees award because there was no evidence of reasonable and necessary fees as to the claim for which Carrizo was entitled to recover attorney's fees. But, in Question 14, the trial court asked the jury to find reasonable fees for the necessary services of Carrizo's attorneys, without limiting the fees to any claim and without requiring segregation of attorney's fees. No party objected to this question at the charge conference. Because Trinity did not object to the lack of any requirement in the jury charge that the attorney's fee be segregated, Trinity waived this complaint.[9] *See Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997) (holding that parties waived error regarding failure to segregate attorney's fees because they did not object when the court's charge failed to require segregation); *Bencon Management & General Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (same as *Green Intern., Inc.*). Therefore, we reject Trinity's argument based on failure to segregate attorney's fees.[10]

---

[9] Question 15 likewise asked the jury to find a reasonable fee for the necessary services of Trinity's attorneys, without limiting the fees to any claim and without requiring segregation. The trial court awarded to Trinity the fees found by the jury in response to this question.

[10] Trinity does not assert that the evidence is insufficient to support the jury's answer to Question 14, which did not require segregation of attorney's fees.

Trinity also argues that this court must reverse the trial court's award of fees to Carrizo if this court reverses the trial court's judgment as to Carrizo's breach-of-contract, quantum-meruit, and promissory-estoppel claims. We disagree. In its final judgment, the trial court made various declarations relating to the Denton County Agreement that Trinity has not challenged on appeal ("Denton County Declarations"). As discussed above, to show that the trial court erred in awarding attorney's fees to Carrizo, Trinity must establish that this award was improper under Texas Civil Practice and Remedies Code section 37.009. But, on appeal, Trinity has not asserted that the award is improper under this statute, nor has Trinity cited to any legal authorities that would demonstrate that this award of attorney's fees to Carrizo is unwarranted or impermissible under this statute.

On rehearing, Trinity asserts that it won at trial regarding the Denton County issues. But Trinity has not asserted that the award was improper under Texas Civil Practice and Remedies Code section 37.009. It is not apparent from the face of the Denton County Declarations which of them favor Trinity and which favor Carrizo. It appears that one or more of the declarations in the trial court's judgment are in favor of Carrizo. In any event, the award of attorney's fees in a declaratory-judgment action is within the trial court's discretion and is not dependent upon a finding that a party substantially prevailed. *See Barshop v. Medina*, 925 S.W.2d 618, 637–38 (Tex. 1996); *Chase Home Fin., L.L.C., v. Cal West. Reconveyance Corp.*, 309 S.W.3d 619, 634 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Trinity has not argued, and this court has not concluded, that the trial court erred in granting any of the Denton County Declarations.

Concluding that the arguments asserted by Trinity under its tenth issue lack merit, we overrule that issue.[11]

---

[11] Trinity asserts that this court cannot affirm the attorney's fees award in favor of Carrizo based

**E.     What is the appropriate judgment in this appeal?**

The evidence is legally insufficient to support at least one of the essential elements of Carrizo's breach-of-contract, quantum-meruit, and promissory-estoppel claims ("Carrizo's Claims").  Therefore, the trial court erred in rendering judgment that Trinity is indebted in to Carrizo in any amount based upon Carrizo's Claims, and rendition of such a judgment is not appropriate in response to Carrizo's conditional *Boyce Iron Works* elections.  In this situation, a proper appellate judgment ordinarily would be one in which this court modifies the part of the trial court's judgment dealing with Carrizo's Claims to delete all monetary awards in Carrizo's favor and to render the judgment the trial court should have rendered, and then affirms the judgment as modified.  Or, a proper appellate judgment also might be one in which this court reverses the trial court's judgment in part and renders the judgment the trial court should have rendered.

Before rendering a money judgment in favor of Carrizo, the trial court gave Trinity credit for an offset in the amount of $816,210.64 that Carrizo had applied to various amounts owed by Carrizo to Trinity.  Under the language of the trial court's judgment, it appears that some of this offset amount may be attributable to "the sale of production attributable to an undivided two percent (2%) of 8/8ths of seventy percent (70%) overriding royalty interest (to the extent of Trinity's ownership interest in a respective unit) on a well by well basis through the point of first sale of oil and gas in and to the Leases and Lands in the Barnett Shale Drilling Program, from the end of trial to the present."  To the extent that the offset amount

upon the part of the judgment regarding the Denton County Agreement because Carrizo did not make this argument in its appellee's brief on original submission.  Even if Carrizo failed to make this argument on original submission, Carrizo, as appellee, was not required to make this argument.  Rather, Trinity was required on original submission to show the impropriety of the attorney's fees award under Texas Civil Practice and Remedies Code section 37.009.

is based on the sale of production that is or would be attributable to an interest in one of the Commitment Wells referenced in the Participation Agreement, the offset amount should not be added to the sum of the amounts of indebtedness of Carrizo to Trinity to arrive at the principal amount of the judgment to be rendered in Trinity's favor. To the extent that the offset amount is based on the sale of production attributable to an interest in a well in Denton County, Texas, the offset amount should be added to the sum of these amounts to arrive at the principal amount of the judgment to be rendered in Trinity's favor. But we are not able to tell from the judgment or the record the extent, if any, to which this offset amount is based on the sale of production that is or would be attributable to an interest in one of the Commitment Wells referenced in the Participation Agreement. Thus, based upon the form of the trial court's judgment, we are not able to effectively render judgment or affirm the trial court's judgment as modified, and a remand is necessary for further proceedings. *See* Tex. R. App. P. 43.3.

## V. CONCLUSION

Under the applicable standard of review, the trial evidence is legally insufficient to support the jury's findings in response to Questions 1, 4, and 6. The trial court erred in rendering judgment that Trinity is indebted in any amount to Carrizo based upon Carrizo's Claims. Rendition of such a judgment is not appropriate in response to Carrizo's conditional *Boyce Iron Works* elections. Ordinarily, this court either would affirm the trial court's judgment as modified or would reverse the trial court's judgment in part and render the judgment the trial court should have rendered. But, based upon the form of the trial court's judgment, this court is not able to effectively render judgment or affirm the trial court's judgment as modified.

We affirm the part of the trial court's judgment in which the trial court makes the Denton County Declarations, which Trinity has not challenged on

appeal. As described in more detail in our judgment, we sever and reverse the remainder of the trial court's judgment, and remand this part of the judgment to the trial court for the limited purpose of (1) further proceedings necessary to determine the amount, if any, of the $816,210.64 offset in the trial court's 2010 judgment that is not based on the sale of production that is or would be attributable to an interest in a well referenced in article 2.2 of the Participation Agreement and (2) rendition of a new, final judgment in accordance with the instructions contained in this court's judgment on appeal.


/s/    Kem Thompson Frost
       Justice


Panel consists of Justices Frost, Seymore, and Jamison. (Seymore, J., concurring) (Jamison, J., concurring).