

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-16-00282-CV

_____

MUSA ('MOSES') N. MUSALLAM, Appellant

V.

AMAR B. ALI, Appellee

---

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-266677-13

---

Before Gabriel, Pittman, and Bassel, JJ.
Memorandum Opinion on Remand by Justice Gabriel

**MEMORANDUM OPINION ON REMAND**

This case is before us on remand from the supreme court. In June 2013, appellant Musa ('Moses') N. Musallam and appellee Amar B. Ali signed a document entitled "Stock Transfer and Asset Purchase and Sale Agreement" (the Purchase Agreement). A jury found that Musallam breached that agreement and awarded Ali damages in excess of $900,000 for past and future lost profits. The trial court rendered judgment on the jury's verdict. Musallam appealed to this court, raising three issues. In the first, he argued the trial court erred by rendering judgment on the jury's verdict because the Purchase Agreement was not a binding, enforceable contract. In the second, Musallam argued the jury's award of past and future lost profits damages was not supported by legally sufficient evidence. And in the third, Musallam argued the trial court erred by refusing to include a question in the jury charge.

On original submission, we did not address Musallam's first issue because we concluded he had waived it. We also held that the jury's damages award was supported by legally sufficient evidence. And we concluded Musallam had inadequately briefed his third issue. We therefore overruled all of Musallam's issues and affirmed the trial court's judgment.

Musallam appealed to the supreme court, arguing that he did not waive his first issue and that we should have therefore considered its merits. *See Musallam v. Ali*, 560 S.W.3d 636, 639 (Tex. 2018). Musallam also asked the supreme court to address

the merits of his first issue in the first instance. *Id.* at 640. The supreme court agreed with Musallam that he did not waive his first issue. *Id.* at 639. But after turning to the merits of Musallam's assertion that the Purchase Agreement was not a binding, enforceable contract, the supreme court declined to address that argument in the first instance and instead remanded the case to this court for us to "first address issues properly preserved but which [it had] not addressed." *See id.* at 640. As noted, we addressed Musallam's second and third issues in our prior opinion, and those issues were not the subject of the supreme court's opinion. Thus, we do not address those issues in this opinion on remand.

In his first issue, Musallam argues that the Purchase Agreement is not an enforceable contract and, thus, the trial court erred by denying his motion for judgment notwithstanding the verdict and by entering judgment in accordance with the jury's verdict. We affirm.

## I. PROCEDURAL AND BACKGROUND FACTS

In 2007, Musallam acquired Fanci Candy Company, a business that distributes tobacco products (among other things) to convenience stores in north Texas. Fanci Candy held direct distribution agreements with two of the three major tobacco companies in the United States. One of those agreements was with Altria Group Distribution Company, the parent company of several tobacco manufacturers, including Philip Morris USA, U.S. Smokeless Tobacco Company, and John Middleton Company. Fanci Candy's direct distribution agreement with Altria allowed it to

3

purchase tobacco products directly from Philip Morris and U.S. Smokeless Tobacco. Fanci Candy's second direct distribution agreement allowed it to directly purchase tobacco products manufactured by Lorillard Tobacco Company, Inc.[1]

Because of the way the tobacco industry works, it is difficult to obtain direct distribution agreements like the ones Fanci Candy had with Altria and Lorillard because those companies rarely, if ever, enter into such agreements with new distributors. Thus, if a distributor wants to purchase tobacco products directly from Altria or Lorillard but does not already have direct distribution agreements with one of them, the main way for it to get those agreements is to purchase a company that has an existing agreement with Altria or Lorillard and then be grandfathered into the acquired company's agreements.

Ali's father owned A to Z Wholesalers, Inc. Like Fanci Candy, A to Z Wholesalers distributed tobacco products to convenience stores. But unlike Fanci Candy, A to Z Wholesalers did not have a direct distribution agreement with Altria allowing it to directly purchase tobacco products from Philip Morris or U.S. Smokeless Tobacco, nor did it have a direct distribution agreement with Lorillard allowing it to directly purchase its tobacco products. So in order for A to Z Wholesalers to distribute those tobacco products to convenience stores, it first had to purchase them from a middleman.

---

[1]At trial, the evidence showed that Lorillard had since been acquired by R.J. Reynolds Tobacco Company.

4

Ali was A to Z Wholesalers' vice president and general counsel and was essentially responsible for running it. Toward the end of 2012, Musallam decided to sell Fanci Candy. Ali became interested in personally purchasing Fanci Candy because it would provide a means by which he could be grandfathered into Fanci Candi's direct distribution agreements with Altria and Lorillard. With those agreements in hand, Ali could then acquire Philip Morris's, U.S. Smokeless Tobacco's, and Lorillard's tobacco products at the lower cost Fanci Candy was able to. He could then replace A to Z Wholesalers' middleman and sell those tobacco products to A to Z Wholesalers (and other distributors) himself at the same marked-up price the middleman had been charging. Because Ali could sell the tobacco products at a higher price than it cost him to acquire them, he would earn a profit.

Musallam and Ali reached a tentative agreement for the sale of Fanci Candy. On January 25, 2013, they signed a letter of intent outlining the basic terms of their agreement. The letter, bearing A to Z Wholesalers' letterhead, stated that Ali's father and/or A to Z Wholesalers would purchase Fanci Candy's stock and assets with an "[i]mmediate" closing date, "subject to preapproval from Philip Morris USA, U.S. Smokeless Tobacco Brands, Inc.[,] and Lorillard Tobacco Company."[2] In addition,

_____

[2]Ali signed the letter of intent in the capacity of A to Z Wholesalers' vice president and general counsel. The letter provided that the buyer had the right to assign the offer to any other individual or company. At trial, Ali testified that when they signed the letter, he and Musallam were preparing applications to send Altria and Lorillard to secure their approval of Fanci Candy's sale. According to Ali, Musallam believed Altria and Lorillard were more likely to approve the sale if A to Z

5

the letter stated that it was "not intended to, and [did] not create any binding legal obligation" on the parties and was not "intended to be construed as an agreement-in-principal, agreement to agree, contract, or agreement." It also stated that the terms outlined in the letter "shall be incorporated into a formal agreement . . . , which shall be negotiated at a later date."

A month after signing the letter of intent, Musallam sent applications to Altria and Lorillard requesting their approval of the sale. By letter dated April 11, 2013, Altria responded to the application. The letter stated that Altria had "decided not to approve [Ali's] company for direct distributor status at this time." Musallam believed the reason Altria had withheld its approval was because it was under the impression that he and Ali intended the sale of Fanci Candy to be a corporate acquisition by A to Z Wholesalers. So Musallam and Ali decided to resubmit the approval application to Altria, this time showing that Ali would be purchasing all of Fanci Candy's stock.

To effectuate the plan to resubmit the approval application to Altria, Ali executed another letter of intent, this time placing his own name on the letterhead instead of A to Z Wholesalers'. The terms outlined in this letter of intent were essentially the same as those in the previous one, with an important difference being that the new letter listed Ali and/or his father, individually, as the purchasers. On May 1, 2013, Ali resubmitted the application to Altria, clarifying that A to Z

Wholesalers was listed as the buyer, so Musallam recommended they list the buyers as Ali's father and A to Z Wholesalers instead of Ali.

6

Wholesalers was not the intended buyer of Fanci Candy and again requesting Altria to approve the sale. Altria responded on June 7, 2013, stating that it had approved Ali for direct distributor status based on his plan to purchase Fanci Candy's stock.

By contrast, as of June 7, 2013, Lorillard had not yet provided its written approval of the contemplated sale. But it had sent Musallam an email on June 4, 2013, acknowledging its receipt of the application for approval and stating that "[f]or future reference[,] A - Z Wholesale [would] receive a financial statement request letter on an annual basis for Fanci Candy Company." Based on this email, Musallam believed Lorillard would approve Ali's purchase of Fanci Candy. Ali, however, asked Musallam to obtain formal written approval from Lorillard. So on June 6, 2013, Musallam replied to the email from Lorillard, asking it to "please send [him] a formal letter on Lorillard letterhead approving [Ali] for [the] Stock ownership change[.]"

On June 18, 2013—having secured Altria's formal approval but still lacking Lorillard's—Musallam and Ali signed the Purchase Agreement. Section 1.01 of the agreement provided that Ali agreed to purchase from Musallam, and Musallam agreed to sell to Ali, one-hundred percent of Fanci Candy's stock at a closing set to occur on or before July 1, 2013. Section 1.02 provided that in addition to the purchase and sale of Fanci Candy's stock, and as contemplated in Article II of the Purchase Agreement, Ali agreed to accept, and Musallam agreed to convey, what the provision referred to as "Purchased Assets."

Under Section 1.02, Purchased Assets referred to the terms "Land," "Building," "Inventory," "Vehicles," "Furniture, Fixtures and Equipment," (FF&E) and "Accounts Receivable." Each of those terms was defined in the agreement. The Purchase Agreement also set forth the purchase price for the transaction in Section 1.03:

> 1.03 **Consideration**. As consideration for [Musallam's stock in Fanci Candy], [Ali], at the Closing, will pay to [Musallam] the purchase price (the "Purchase Price") in an amount as follows:
>
> Total purchase price: $500,000.00*, plus Purchased Assets.
>
> *unless reduced as provided in Section 5.01(c).

The Purchase Agreement defined the value of each category composing the Purchased Assets as follows:

> 2.03 **Purchase price of "Inventory".** [Ali] and [Musallam] agree that the value of the Inventory, as defined under the Article and Agreement, will be appraised at [Musallam's] cost at the Closing Date. This Inventory appraisal shall be attached to this Agreement on the Closing Date as Exhibit D. [Ali] will compensate [Musallam] for the Inventory at this appraisal value.
>
> 2.04 **Purchase price of "Land" and "Building".** [Ali] and [Musallam] agree that the value of the Land and Building, as defined under the Article and Agreement, will be appraised on or before the Closing Date at [Ali's] expense. The parties agree that this appraisal must be generated by a licensed/certified appraiser as chosen by [Ali]. This appraisal shall be attached to the Agreement on the Closing Date as Exhibit E.
>
> 2.05 **Purchase price of "Vehicles".** [Ali] and [Musallam] agree that the value of the Vehicles, as defined under the Article and Agreement, shall be the Kell[e]y Blue Book Value of the Vehicles on the Closing

8

Date. Evidence of these values shall be attached to the Agreement as Exhibit C.

2.06 **Purchase price of "FF&E".** [Ali] and [Musallam] agree that the value of the FF&E, as defined under the Article II, Section 2.01 of this Agreement, shall be as mutually agreed upon by the parties prior to the Closing Date. Evidence of this mutual agreement shall be attached to the Agreement as Exhibit B.

2.07 **Purchase price of "Accounts Receivable".** [Ali] and [Musallam] agree[] that the value of the Accounts Receivable assumed by [Ali] from [Musallam], and as defined under Article II, Section 2.01 of this Agreement, shall be the total amount of the account(s) on the date of Closing. Evidence of the balance of these accounts shall be attached to this Agreement as Exhibit J.

As noted, Section 1.03 says that the Purchase Price could be reduced "as provided in Section 5.01(c)." In relevant part, that section states the following:

5.01 **Conditions Precedent to [Musallam's] Obligation to Sell the Stock.** The obligation of [Musallam] to sell [Fanci Candy's stock] is subject to the fulfillment prior to or at the Closing of the following conditions:

. . . .

(c) [Musallam] shall obtain formal written approval from the following suppliers on suppliers' official corporate letterhead confirming that any direct contracts that exist between said suppliers and [Fanci Candy] shall remain in full force and effect after the transfer of [Fanci Candy's stock], and shall remain in full force and effect for the remainder of the existing contract: 1) Altria Group Distribution Company to include: Phillip Morris, USA and U.S. Smokeless Tobacco Brands, Inc., and 2) Lorillard Tobacco Company, Inc. The parties agree that written approval of both Altria Group Distribution Company and Lorillard Tobacco Company and the continuing existence of the direct contracts with these companies is material in inducing [Ali] to enter into this Agreement with [Musallam]. Accordingly, should [Ali] fail to obtain written approval from either company (or written approval secured by [Musallam]), the

9

Purchase Price shall be reduced to Two Hundred and Fifty Thousand Dollars and 00/100 ($250,000.00).

After executing the Purchase Agreement, Musallam and Ali continued to work toward closing the deal. Ali wrote a $10,000 earnest-money check, and Musallam received it, though he did not cash it. Ali also hired a licensed appraiser to perform an appraisal of Fanci Candy's land and building. Musallam continued working with Ali, instructing his employees to provide Ali with any financial documents Ali needed and affording Ali access to Fanci Candy's warehouse as needed. At some point, Musallam provided Ali with his proposed value for Fanci Candy's FF&E. By Musallam's calculation, the value of the FF&E was approximately $194,000.

As the Purchase Agreement's July 1, 2013 closing date approached, however, the deal went awry in the face of at least three hurdles. First, on June 26, 2013, Musallam learned that Lorillard had decided not to approve the proposed sale of Fanci Candy. Second, a short time before June 28, 2013, Ali sent Musallam a proposed closing statement that reflected he did not agree with Musallam's valuation of Fanci Candy's FF&E. Ali estimated the FF&E was worth approximately $53,000, a figure that was some $140,000 less than Musallam had calculated. And third, as of late morning on June 28, 2013, Musallam had not received a copy of the appraisal for Fanci Candy's building and land.

At approximately 11:30 a.m. on June 28, 2013 (a Friday), Musallam emailed Ali the following:

I have reviewed your proposed closing statement[,] and the numbers are completely unacceptable.

I am willing to negotiate the FF[&]E but you are far too low. Also, we still do not have the building appraisal. Why has it taken so long to get this information?

Additionally[,] you know we both assumed we had the Lorillard approval. The deal does not work for me with a 250k reduction. We are trying to resolve the issue[,] but it will not happen by Monday [July 1, 2013].

I see no choice but to postpone the closing until we can resolve these issues.

Please let me know if you agree or what other arrangements you propose.

I want to make this work[,] but I cannot give the company away. Please be reasonable as we try to get this done[.]

[Signature]

We do [s]till need a letter from you to Lorillard to solve the situation with [a] copy of the agreement in the same way we did with Altria please.

And at approximately 1:45 p.m., Musallam sent a text message to Ali stating,

Amar, closing will not happen on Monday based on the email I sent you. I just asked our employees not to send any more information over until we both agree on an action plan, hope you respect this request and not to get the employees involved in [a] situation that need[s] to be resolved between us.

As for Musallam's reference in his email to the need for Ali to send a letter to Lorillard, Musallam believed Lorillard had withheld its approval for the same reason Altria initially had and that he and Ali could ultimately obtain Lorillard's approval by resubmitting their application with the same changes they had previously made in

11

their resubmission to Altria. Sometime on June 28, 2013, Ali resubmitted the application to Lorillard. And at approximately 2:45 p.m., he emailed Musallam a copy of the appraisal for Fanci Candy's building and land that Musallam had referenced in his email that morning.

Also on June 28, 2013, and in response to Musallam's communications indicating that the closing would not take place on July 1, 2013, Ali had his attorneys send a letter to Musallam. The letter stated that Ali intended to close on July 1, 2013, as provided by the Purchase Agreement; that under the Purchase Agreement, Lorillard's failure to approve the sale did not rescind the agreement; that without Lorillard's approval, the purchase price would be reduced as provided under Section 5.01(c) of the agreement; and that Musallam's attempt to postpone the closing and his failure to provide Ali with information necessary for closing amounted to an anticipatory repudiation of the agreement. The letter further said that if Musallam failed to close the deal on July 1, 2013, Ali would seek specific performance of the Purchase Agreement.

Ali showed for the anticipated closing on July 1, 2013, but Musallam did not, and the deal never closed. On July 2, 2013, Musallam sued Ali. In his petition, as amended, Musallam sought declaratory relief, requesting the trial court to declare that the Purchase Agreement was unenforceable and void because, among other reasons, he and Ali "did not agree to all of the essential terms of the agreement." Specifically, Musallam alleged that he and Ali never agreed upon the total price of the sale. In the

12

alternative, Musallam sought a declaration that he did not breach the Purchase Agreement.[3]

Ali answered and brought counterclaims against Musallam, including a counterclaim for breach of contract. The case proceeded to trial before a jury. In his opening statements, Musallam focused the jury primarily on two theories of the case: he told the jury that the evidence would show not only that he and Ali never reached an agreement on the price of Fanci Candy's sale but also that Ali had suffered no damages. At the charge conference, the trial court proposed its charge, which included Question No. 1, a question concerning contract formation. As submitted to the jury, Question No. 1 read as follows:

## QUESTION NO. 1

Did Moses Musallam and Amar Ali agree to the sale and transfer of Fanci Candy Company in the Stock Transfer and Asset Purchase and Sale Agreement?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

If Moses Musallam and Amar Ali agreed to other essential terms but failed to specify price, it is presumed a reasonable price was intended.

Answer "Yes" or "No."

---

[3]Musallam also asserted, in the alternative, claims for fraud, negligence, and breach of contract. Those claims are not at issue in this appeal.

Answer:_____

Musallam told the trial court that he had no objections to the submission of Question No. 1. Ali, however, did object, arguing that the question should not be submitted to the jury because the evidence was "clear and unequivocal" that he and Musallam intended the Purchase Agreement to be a valid, binding contract on the date they signed it and consequently, there was no question that he and Musallam had reached an agreement.

In response, Musallam maintained Question No. 1 had to be submitted to the jury. He cited this court's decision in *Playoff Corp. v. Blackwell* as the legal basis of his argument. *See* 300 S.W.3d 451 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g). He specifically quoted the following language from that opinion: "It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *See id.* at 455. Musallam argued that "whether or not the agreement on the FF[&]E[] and other issues was a material term" of the Purchase Agreement was a question of fact that the jury needed to resolve "before we can determine whether or not there was, in fact, a binding agreement."

The trial court overruled Ali's objection to Question No. 1 and submitted it to the jury. The jury answered "Yes" to Question No. 1, found that Musallam had breached the Purchase Agreement, and awarded Ali $904,924 in damages for past and future lost profits. The trial court rendered judgment accordingly, ordering that Ali

14

recover from Musallam the damages the jury awarded, prejudgment interest, attorneys' fees, and costs. The court's judgment also ordered that Musallam and Fanci Candy take nothing from Ali and dismissed with prejudice all the claims they had asserted against Ali.

Musallam filed a motion for new trial and a motion for judgment notwithstanding the verdict or, in the alternative, motion to disregard (JNOV). The trial court denied both motions. Musallam appealed.

## II. THE TRIAL COURT DID NOT ERR BY DENYING MUSALLAM'S JNOV MOTION AND ENTERING JUDGMENT ON THE JURY'S VERDICT

In his first issue, Musallam challenges the trial court's denial of his JNOV motion. He argues that because the question whether a particular agreement is an enforceable contract is a question of law, the jury's finding that he and Ali "intended to enter into an agreement" (i.e., its affirmative finding on Question No. 1) is immaterial. And he argues that the evidence conclusively proves that he and Ali never reached a meeting of the minds as to the total price of Fanci Candy's sale, an essential term of their agreement. Rather, he argues the Purchase Agreement merely constitutes an unenforceable agreement to agree. He maintains the trial court erred by failing to disregard the jury's findings, denying his JNOV motion, and rendering judgment in accordance with the jury's verdict.

## A. STANDARD OF REVIEW

A trial court may grant a JNOV motion only if a directed verdict would have been proper, and it may disregard a jury finding only if the finding is unsupported by evidence or the finding is immaterial. *See* Tex. R. Civ. P. 301; *USAA Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 505 (Tex. 2018) (citing *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994)); *Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 467 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A jury finding is immaterial when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157.

We review the denial of a JNOV motion under a legal-sufficiency or "no-evidence" standard, meaning we credit evidence favoring the jury verdict if reasonable jurors could, and we disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). We will uphold the denial of a JNOV motion if more than a scintilla of competent evidence supports the verdict. *Id.* Evidence exceeds a scintilla when it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

## B. APPLICABLE LAW

To prevail on a breach of contract claim, a plaintiff must prove, among other elements, the existence of a valid contract. *See Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 622–23 (Tex. App.—Fort Worth 2005, no pet.). For a valid contract to exist, there must be (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) an execution and delivery of the contract with the intent that it be mutual and binding. *McCoy v. Alden Indus., Inc.*, 469 S.W.3d 716, 728 (Tex. App.—Fort Worth 2015, no pet.). In his brief, Musallam contends the third element is missing in this case, arguing that the evidence conclusively establishes that he and Ali did not reach a meeting of the minds on all the essential terms of their agreement.

"Meeting of the minds" describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract. *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 720 (Tex. App.—Fort Worth 2008, pet. dism'd). In other words, to have a meeting of the minds, the parties to a contract must agree to its essential terms. *See 2001 Trinity Fund, LLC v. Carrizo Oil & Gas, Inc.*, 393 S.W.3d 442, 449 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *City of The Colony*, 272 S.W.3d at 720; *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("The material terms of the contract must be agreed upon before a court can enforce the contract."). If that occurs, a contract will not be unenforceable merely because the parties left other, nonessential terms open for

17

future agreement. *See Crews v. Dkasi Corp.*, 469 S.W.3d 194, 199 (Tex. App.—Dallas 2015, pet. denied); *City of The Colony*, 272 S.W.3d at 720. However, nonessential terms left open for future negotiation are not part of the enforceable portion of the contract. *See Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 868 (Tex. App.—Tyler 2010, pet. denied).

It is only when contracting parties leave an essential term open for future negotiation that no binding contract exists. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221; *City of The Colony*, 272 S.W.3d at 720; *see also Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." (citation omitted)). An essential term is one that the parties would reasonably regard as a vitally important ingredient of their bargain. *Fischer*, 479 S.W.3d at 237.

## C. ANALYSIS

### 1. The Jury's Finding on Contract Formation is Not Immaterial

We begin our analysis by addressing Musallam's contention that the jury's answer to Question No. 1 is immaterial because whether an agreement constitutes an enforceable contract is a question of law. It is true that a court may disregard a jury's finding as immaterial if the finding is in response to a question of law. *See Spencer*, 876 S.W.2d at 157. And it is also true that whether an agreement constitutes a contract is generally a question of law. *See, e.g., Effel v. McGarry*, 339 S.W.3d 789, 792

18

(Tex. App.—Dallas 2011, pet. denied). But when a meeting of the minds is contested, determination of the existence of a contract is a question of fact. *In re S.M.H.*, 523 S.W.3d 783, 795 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Mahon v. Mahon*, No. 03-12-00033-CV, 2012 WL 3068205, at *2 (Tex. App.—Austin July 27, 2012, pet. denied) (mem. op.); *Hallmark v. Hand*, 885 S.W.2d 471, 476–77 (Tex. App.—El Paso 1994, writ denied); *see also Brandt Cos., LLC v. Beard Process Solutions, Inc.*, No. 05-17-00780-CV, 2018 WL 4103210, at *10 (Tex. App.—Dallas Aug. 29, 2018, pet. granted, judgm't vacated w.r.m.) (mem. op.) ("Generally, whether an agreement is an enforceable contract is a question of law. However, when a meeting of the minds is contested, the determination of the existence of a contract may be a question of fact." (citations omitted)). In the trial court, Musallam and Ali vigorously disagreed on whether they reached a meeting of the minds on all the essential terms of their agreement, and there was conflicting evidence at trial on that issue. Thus, whether Musallm and Ali reached a meeting of the minds on all the essential terms of their agreement was a question of fact that was appropriately submitted to the factfinder—the jury, in this case. For that reason, we disagree with Musallam that the jury's affirmative finding on Question No. 1 is immaterial.

## 2. More Than a Scintilla of Evidence Supports The Jury's Contract-Formation Finding

We turn now to Musallam's contention that the evidence conclusively established that he and Ali never reached a meeting of the minds on all the essential

19

terms of the Purchase Agreement. Musallam specifically focuses on the Purchase Agreement's total-price term, and his argument runs as follows. Under the Purchase Agreement, the total price of the transaction includes the value of Fanci Candy's Vehicles and FF&E. The Purchase Agreement in turn provides that the value of the Vehicles and FF&E would be determined by a future agreement between Musallam and Ali, and it does not provide any alternative mechanism to determine the value of those items if they failed to reach such an agreement. The evidence at trial conclusively proved that Musallam and Ali failed to reach a subsequent agreement as to the value of the Vehicles and FF&E. Consequently, Musallam and Ali never reached a meeting of the minds on the total price of the sale, an essential term of the agreement.

For the reasons set out below, we conclude that more than a scintilla of evidence supports the jury's finding that Musallam and Ali agreed to the essential terms for the sale and transfer of Fanci Candy in the Purchase Agreement.

### a. The Vehicles

We begin with Musallam's contention that he and Ali did not reach a meeting of the minds on an essential term of their agreement because the evidence conclusively proves that he and Ali never agreed upon the value of Fanci Candy's Vehicles.

The Purchase Agreement was introduced into evidence at trial. As noted above, the Purchase Agreement provided that Musallam and Ali "agree[d] that the

20

value of the Vehicles . . . shall be the Kell[e]y Blue Book Value of the Vehicles on the Closing Date." The Purchase Agreement has both Musallam's and Ali's signatures, and at trial they both testified that they had signed it. From this evidence, the jury could have reasonably found that Ali and Musallam agreed that the value of Fanci Candy's Vehicles would be whatever their Kelley Blue Book value was on the date of closing. An agreement to use the Kelley Blue Book valuation of Fanci Candy's Vehicles as of a certain date is sufficient to establish that Musallam and Ali agreed upon the value of the Vehicles. *See Penwell v. Barrett*, 724 S.W.2d 902, 905 (Tex. App.—San Antonio 1987, no writ) (noting that "[w]hen an agreement provides a standard to be applied in determining price, the contract is sufficiently definite to be enforceable" and that "[w]hen the parties to an agreement specify that a third person is to fix the price, the contract is not unenforceable for lack of definiteness" (citations omitted)). Accordingly, we conclude there is more than a scintilla of evidence to support a finding that Musallam and Ali agreed upon the value of Fanci Candy's Vehicles.

### b. The FF&E

We turn to Musallam's contention that he and Ali did not reach a meeting of the minds on an essential term of their agreement because the evidence conclusively proves that he and Ali never agreed upon the value of Fanci Candy's FF&E.

21

### i. The Evidence Conclusively Proves Musallam And Ali Did Not Agree Upon The Value of The FF&E

The Purchase Agreement provided that Musallam and Ali "agree[d] that the value of the FF&E . . . shall be as mutually agreed upon by the parties prior to the Closing Date." Musallam contends the evidence conclusively proves that he and Ali never reached a subsequent agreement on the value of the FF&E. With that contention we agree. The documentary evidence shows that prior to the closing date, Musallam sent Ali a document listing the items he believed should be included in Fanci Candy's FF&E and his proposed value for each item, for a total of $194,332.18. Three days prior to the closing date, Ali responded with a written counteroffer in which he proposed $52,956.26 as the value of the FF&E he wanted to purchase.[4] There was no documentary evidence showing Musallam and Ali ever bridged the gap between their respective proposals for the FF&E to be transferred as part of the sale and, as a result, the value of the FF&E. Both Musallam and Ali testified that they never reached an agreement upon the value of the FF&E. The evidence conclusively

---

[4]Ali testified that in Musallam's proposal for the value of the FF&E, he had included items that did not constitute FF&E under the agreement. According to Ali, Musallam's proposed valuation of the FF&E included items that constituted inventory, such as slushy machines, popcorn machines, coffee machines, nacho machines, and cotton-candy machines. Ali further testified that Musallam had also included vehicles in his valuation of the FF&E. Ali's written counteroffer included a spreadsheet showing how Ali reached his valuation for the FF&E. Ali's valuation excluded the vehicles that Musallam's proposal had included. Further, Ali's valuation excluded items such as the slushy machines, popcorn machines, coffee machines, nacho machines, and cotton-candy machines, among other items, all of which Ali noted would remain with Musallam.

establishes that Musallam and Ali never agreed upon the value of the FF&E prior to closing.

## ii. More Than a Scintilla of Evidence Supports a Finding That The FF&E Was Not an Essential Term or That a Reasonable Price Was Intended

Our conclusion that the evidence conclusively shows that Musallam and Ali did not agree upon the value of the FF&E does not end the matter.[5] For even in the

---

[5]Musallam maintains that because the items of FF&E were part of the Purchase Agreement's total purchase price, his and Ali's failure to agree upon the value of the FF&E means they failed to agree upon the total purchase price, an essential term of the Purchase Agreement. He elaborated in his reply brief, stating that the cases he cited in his opening brief demonstrated that "every [Texas] appellate court, without exception, has held that price is always a material term in a purchase agreement." Musallam appears to be arguing that as a matter of law, price is always an essential term and that the failure to agree upon price always renders an agreement unenforceable. But the cases Musallam cites do not support these propositions.

For example, Musallam cited *Crisp Analytical Lab, L.L.C. v. Jakalam Props., Ltd.*, 422 S.W.3d 85, 89–90 (Tex. App.—Dallas 2014, pet. denied). But the court in that case did not state that price "is always a material term" in a purchase agreement; rather, it stated that the essential terms of a contract "may" include, among other things, the price to be paid. *Id.* The other cases Musallam cited provide similarly. *See Learners Online, Inc. v. Dallas Indep. Sch. Dist.*, 333 S.W.3d 636, 643 (Tex. App.—Dallas 2009, no pet.) (stating the essential terms of a contract "may" include, among other things, price to be paid); *see also Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006) (noting "[a]s a general matter" that Texas courts have consistently held that a contract "may" be held void for indefiniteness if it fails to specify, among other things, the price to be paid).

Additionally, as we discuss in more detail below, it is not true that failure to specify price always renders a contract unenforceable. *See, e.g.*, *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam) ("Where the parties have done everything else necessary to make a binding agreement for the sale of goods or services, their failure to specify the price does not leave the contract so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended." (citation omitted)); *Crisp Analytical*, 422 S.W.3d at 90 ("While the

23

absence of such an agreement, the jury nevertheless could have found that Musallam and Ali agreed to the sale and transfer of Fanci Candy in the Purchase Agreement. That is so because the jury could have found either that the value of the FF&E was not an essential term[6] or that if it was, Musallam and Ali agreed to the other essential terms in the Purchase Agreement, giving rise to a presumption that they intended the FF&E to have a reasonable price.[7] *See Fischer*, 479 S.W.3d at 240 ("[W]hen the parties have done everything else necessary to make a binding agreement . . . , their failure to specify the price does not leave the contract so incomplete that it cannot be enforced.

_____

amount to be paid may be an essential term of a contract, the failure to specify a price does not necessarily render the contract so indefinite as to be unenforceable." (quotations omitted)); *see also Fischer*, 479 S.W.3d at 241 (noting that where parties intended to be bound to their agreement, presumption that reasonable price was intended applies even if the price was left to be agreed by the parties and they failed to agree).

[6]In his opening brief, Musallam asserted that it is undisputed that every component of the Purchase Agreement's total purchase price was essential. That is not so. For one thing, earlier in his opening brief, Musallam stated that throughout the entire case, Ali had taken the position that the value of the FF&E was not a material term of the Purchase Agreement. For another thing, in his response brief, Ali argues that the value of the FF&E is not an essential term of the Purchase Agreement. But perhaps most important to our analysis, Musallam acknowledged there was a dispute over whether the value of the FF&E was a material term when he insisted at the charge conference, over Ali's objection, that Question No. 1 needed to be submitted specifically because "whether or not the agreement on the FF[&]E[] and other issues was a material term" was "a question of fact for the jury . . . that need[ed] to be determined."

[7]As noted above, the charge instructed the jury that if Musallam and Ali "agreed to other essential terms but failed to specify price, it is presumed a reasonable price was intended." Musallam did not object to this instruction.

24

In such a case it will be presumed that a reasonable price was intended." (quoting *Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex. 1966) (internal quotation and citation omitted))); *Moody v. Betz*, No. 01-96-00220-CV, 1998 WL 394312, at *8 (Tex. App.—Houston [1st Dist.] July 16, 1998, no pet.) (not designated for publication) (noting in case where jury found appellant and appellee reached an agreement and appellant argued on appeal that the parties had never agreed upon two essential terms of the agreement that, in order for the jury to have found an agreement, it must have believed either that the parties agreed to the terms or that the terms were nonessential); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 101.13 (2018). We conclude that more than a scintilla of evidence supports either of those findings.

### (a) The Purchase Agreement

The jury could have considered the Purchase Agreement and reasonably determined that the FF&E's value was not an essential term or that Musallam and Ali intended a reasonable price to apply to the FF&E.

The Purchase Agreement reflected Musallam's and Ali's agreement to numerous terms. It set forth the specific stock and assets that were being purchased. It provided a specific closing date. It enumerated which liabilities Ali would assume and which ones he would not. It stated the conditions precedent to Musallam's obligation to sell the stock and Ali's obligation to purchase the stock. It listed the grounds upon which the agreement could be terminated and consequences of

25

termination. And it set forth the remedies available to Musallam and Ali in the event of a breach or termination of the agreement.

The Purchase Agreement also addressed the consideration to be paid, which was to be a value composed of multiple components. There was a cash component for Fanci Candy's stock. And there was the additional component of the value of the Purchased Assets. The Purchased Assets, in turn, were composed of six categories. For all but one of those categories—the FF&E—the Purchase Agreement provided a specific mechanism for determining value.

Thus, the value of Fanci Candy's Inventory would be based on an appraisal done at Musallam's expense. The value of Fanci Candy's Land and Building would be based on an appraisal done at Ali's expense. The value of Fanci Candy's Vehicles would be their Kelley Blue Book value. And the value of Fanci Candy's Accounts Receivable would equal the total amount of the accounts. It is only the value of Fanci Candy's FF&E that the Purchase Agreement left open for a future agreement between Musallam and Ali. Given the level of detail and specificity of all the non-FF&E terms, including the other terms related to the price, the jury could have reasonably inferred that the reason Musallam and Ali left the value of the FF&E open for future agreement was because the FF&E's value was not a vitally important ingredient of their bargain and, thus, was not an essential term.

Additionally, the Purchase Agreement expressly provided that Altria's and Lorillard's formal written approval of the sale was material to the agreement and that

26

the failure to secure approval from both companies would result in a $250,000 reduction of the purchase price. It also gave Ali the right to terminate the agreement if both Altria and Lorillard failed to approve the sale. There were no similar provisions with respect to the FF&E. Thus, the Purchase Agreement reflected both that Musallam and Ali knew how to provide that a particular term was essential to their bargain and that they did not do so with respect to the value of the FF&E. From this, the jury could have reasonably inferred that Musallam and Ali did not intend for the Purchase Agreement's enforceability to hinge on their subsequent agreement to the FF&E's value—i.e., that they did not intend to make it a condition precedent to the Purchase Agreement's enforceability—but rather that they intended to be immediately bound to the Purchase Agreement. *See Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 748 (Tex. App.—Houston [1st Dis.] 2014, no pet.) ("The critical issue for determining enforceability when the parties agree that some terms will remain open is whether the parties intended for their agreement to be a present binding (enforceable) agreement in the absence of an agreement on the remaining terms or whether they intended their agreement to have no legal significance until agreement on the remaining terms is reached."). Additionally, as noted above, the jury could have reasonably found that Musallam and Ali agreed upon the other essential terms in the Purchase Agreement. Thus, as it was instructed in the charge, the jury could have found that Musallam and Ali intended the FF&E to have a reasonable price. *See Fischer*, 479 S.W.3d at 241 (noting that where the parties

27

intended to be bound to their agreement, the presumption that reasonable price was intended applies even if the price was left to be agreed by the parties and they failed to agree).

### (b) Ali's And Musallam's Testimony

Ali testified that at the time Musallam approached him regarding his potential purchase of Fanci Candy, A to Z Wholesalers did not have a distribution agreement with Altria allowing it to directly purchase Philip Morris's tobacco products, nor did it have a direct distribution agreement with Lorillard allowing it to directly purchase Lorillard's tobacco products. He also testified that Altria and Lorillard rarely entered into direct distribution agreements with new distributors. Ali stated that to him, the value in purchasing Fanci Candy was that doing so would provide a way for him to be grandfathered into Fanci Candy's direct distribution agreements with Altria and Lorillard.

Musallam also testified concerning the value of Fanci Candy's direct distribution agreements. He stated that when he decided to sell Fanci Candy, he realized its real value was in those agreements and that to sell Fanci Candy, he would need to find a buyer who could benefit from the agreements. Musallam said that when he first approached Ali to sell Fanci Candy, the first thing Ali wanted to look at was the details of Fanci Candy's distribution agreements and how much money he could make with those agreements. Musallam acknowledged that if he were in Ali's

shoes, he would be interested in the very same thing. According to Musallam, "That's the value. That's where the money is."

Ali and Musallam both testified that the direct distribution agreements were like "golden ticket[s]" in the tobacco distribution business. They also testified that the $500,000 in goodwill reflected in the Purchase Agreement's total purchase price was based upon the Altria and Lorillard agreements.

In contrast to the direct distribution agreements, Ali testified that the FF&E was not an important part of the deal between Musallam and him.[8] Ali stated that the reason he and Musallam did not specify a price for the FF&E in the Purchase Agreement was because the FF&E were a nominal part of the deal, and the FF&E provision was "sort of a throw-in." He stated that he had reviewed Fanci Candy's financial statements from the previous five years and that those documents showed the reported value of Fanci Candy's FF&E for each of those years was approximately $48,612. Musallam testified that in documents he reported to his bank and the IRS,

---

[8]In his reply brief, Musallam contends there is evidence that the value of the FF&E was important to him and that it does not matter that it was not important to Ali. But this turns our standard of review on its head insofar as it attempts to credit evidence contrary to the jury's verdict and discredit evidence favorable to it. *See Tanner*, 289 S.W.3d at 830 (noting that in reviewing a trial court's ruling on a motion for judgment notwithstanding the verdict, we credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not). At most, Musallam's citation to contrary evidence establishes that the jury heard conflicting evidence concerning the FF&E's importance. It was for the jury to determine the credibility of the witnesses and the weight to give their testimony. *See City of Keller*, 168 S.W.3d at 819. And it also was for the jury to resolve conflicts in the evidence. *See id.* at 820.

29

he listed the value of Fanci Candy's FF&E as $48,612. And Ali testified that although he disagreed with Musallam's initial valuation of the FF&E, if it came down to it, he would have paid Musallam whatever amount he needed to for the FF&E in order to close the deal.

Ali also testified as follows regarding the Purchase Agreement:

> [W]e basically took the elements of the [letter of intent], put them into the contract, renegotiated some terms in the contract, had our attorneys look at it, they redlined it, made their comments, made their changes, and after everybody involved, we finally felt we got a definitive agreement that Mr. Musallam and I signed the contract for the purchase of both the stock and the assets of Fanci Candy.

We conclude that from the above testimony, the jury could have reasonably found that the value of the FF&E was not a vitally important ingredient of Musallam's and Ali's bargain and, thus, was not an essential term. We also conclude that the jury alternatively could have reasonably found that Musallam and Ali agreed upon the other essential terms in the Purchase Agreement and intended to be immediately bound by it; thus, as the charge instructed, the jury could have found that Musallam and Ali intended the FF&E to have a reasonable price.

In sum, we conclude that the jury's answer to Question No. 1 was not immaterial and that more than a scintilla of evidence supports the jury's finding that Musallam and Ali agreed to the sale and transfer of Fanci Candy in the Purchase Agreement. Accordingly, we hold the trial court did not err by denying Musallam's JNOV motion and entering judgment in accordance with the jury's verdict.

30

### 3. The Jury's Finding on Contract Formation is Supported by Legally Sufficient Evidence

On original submission, we did not construe Musallam's first issue to include a challenge to the sufficiency of the evidence to support the jury's finding on Question No. 1. He did not explicitly complain about the sufficiency of the evidence to support the jury's finding on that question, in contrast to his second issue, in which he expressly complained that insufficient evidence supported the jury's award of damages. Nor did he set forth in his brief the typical standards of review applicable to a sufficiency challenge. Further, in his response brief, Ali asserted no less than four times that Musallam did not raise in his opening brief a challenge to the sufficiency of the evidence supporting the jury's answer to Question No. 1. And in his reply brief, Musallam did not say anything to contradict Ali's assertions. However, heeding the supreme court's instruction, we will address whether sufficient evidence supports the jury's answer to Question No. 1.

We note that the relief Musallam requested with respect to his first issue is that we reverse the trial court's judgment, render judgment in his favor on his declaratory action, and remand this case to the trial court, not for a new trial, but rather for a determination of whether he is entitled to attorney's fees. Thus, we address only whether the jury's finding is supported by legally sufficient evidence. *See, e.g., Maynard v. Booth*, 421 S.W.3d 182, 183 (Tex. App.—San Antonio 2013, pet. denied) (reviewing appellant's sufficiency complaint only for legal sufficiency where appellant requested

court to render judgment in her favor and did not request, in the alternative, a remand for a new trial).

### a. Standard of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller*, 168 S.W.3d at 807, 827.

### b. Discussion

Unsurprisingly, because we review a trial court's ruling on a JNOV motion under a legal-sufficiency standard of review, *see Tanner*, 289 S.W.3d at 830, our analysis with respect to the trial court's ruling on Musallam's JNOV motion, as well as the evidence we referenced in that analysis, is equally applicable here. We decline to unnecessarily belabor this opinion with repetitive analysis. Instead, we adopt our

above analysis for purposes of the present discussion regarding whether legally sufficient evidence supports the jury's affirmative finding on Question No. 1 and reference that analysis and evidence as needed.

We focus our sufficiency review on the only element of contract formation that Musallam has challenged: meeting of the minds. Given Musallam's arguments, we consider whether legally sufficient evidence supports the jury's implied finding that Musallam and Ali reached a meeting of the minds on all the essential terms of their agreement.

### i. Vehicles

Musallam asserts that he and Ali did not reach a meeting of the minds on all the essential terms of their agreement because they did not agree upon the value of the Vehicles. But as we have already discussed, there is legally sufficient evidence to support a finding that they did so agree. The Purchase Agreement was entered into evidence, and for the reasons we explained above, the jury could have reasonably concluded from it that Musallam and Ali agreed that the value of the Vehicles would be whatever their Kelley Blue Book values were on the date of closing. *See Penwell*, 724 S.W.2d at 905 (noting that "[w]hen an agreement provides a standard to be applied in determining price, the contract is sufficiently definite to be enforceable" and that "[w]hen the parties to an agreement specify that a third person is to fix the price, the contract is not unenforceable for lack of definiteness" (citations omitted)).

33

## ii. FF&E

Musallam also asserts that he and Ali did not reach a meeting of the minds on all the essential terms of their agreement because they did not agree upon the value of the FF&E. As we have already discussed, we agree that the evidence shows Musallam and Ali never agreed upon the value of the FF&E. But that does not end the analysis. For even in the absence of such an agreement, the jury still could have found they reached a meeting of the minds on the essential terms of their agreement.

First, as we explained above, from the Purchase Agreement, Ali's testimony, and Musallam's testimony, the jury could have reasonably concluded that Musallam and Ali left the value of the FF&E open for future agreement because the FF&E's value was not a vitally important ingredient of their bargain and, thus, was not an essential term of their agreement. *See Moody*, 1998 WL 394312, at *8 (noting in case where jury found appellant and appellee reached an agreement and appellant argued on appeal that the parties had never agreed upon two essential terms of the agreement that, in order for the jury to have found an agreement, it must have believed either that the parties agreed to the terms or that the terms were nonessential).

Second, as we explained above, from the Purchase Agreement, Ali's testimony, and Musallam's testimony, the jury could have reasonably concluded that the value of the FF&E was a material term but that Musallam and Ali agreed to the other essential terms of their agreement, giving rise to the presumption, stated in the jury charge, that Musallam and Ali intended the FF&E to have a reasonable price. *See Fischer*,

34

479 S.W.3d at 240 ("[W]hen the parties have done everything else necessary to make a binding agreement . . . , their failure to specify the price does not leave the contract so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended." (quoting *Bendalin*, 406 S.W.2d at 900)); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 101.13 (2018).

Thus, the record does not show a complete absence of evidence that Musallam and Ali agreed upon all the essential terms of their agreement. Further, no rules of law or of evidence prohibited the Purchase Agreement, Ali's testimony, or Musallam's testimony from being considered. The Purchase Agreement, Ali's testimony, and Musallam's testimony constitute more than a mere scintilla of evidence that Musallam and Ali agreed upon all the essential terms of their agreement. And since the evidence supports that finding, it follows that the evidence does not conclusively establish the contrary. Accordingly, we conclude legally sufficient evidence supports the jury's implied finding that Musallam and Ali reached a meeting of the minds on all the essential terms of their agreement.

We overrule Musallam's first issue.

## III. CONCLUSION

We have considered on remand the issues Musallam properly preserved but which the supreme court did not address. Having overruled Musallam's first issue,

35

and having previously overruled his second and third issues, which are not at issue on remand, we affirm the trial court's judgment.

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: May 2, 2019